## STANFORD *v.* TEXAS.

No. 40.  Argued November 12, 1964.—Decided January 18, 1965.

*Maury Maverick, Jr.,* and *John J. McAvoy* argued the cause for petitioner.  With them on the briefs was *Melvin L. Wulf.*

*James E. Barlow* and *Hawthorne Phillips* argued the cause for respondent.   With them on the brief were *Waggoner Carr,* Attorney General of Texas, and *Howard M. Fender* and *Lonny F. Zwiener,* Assistant Attorneys General.

MR. JUSTICE STEWART delivered the opinion of the Court.

On December 27, 1963, several Texas law-enforcement officers presented themselves at the petitioner's San

Antonio home for the purpose of searching it under authority of a warrant issued by a local magistrate. By the time they had finished, five hours later, they had seized some 2,000 of the petitioner's books, pamphlets, and papers. The question presented by this case is whether the search and seizure were constitutionally valid.

The warrant was issued under § 9 of Art. 6889–3A of the Revised Civil Statutes of Texas. That Article, enacted in 1955 and known as the Suppression Act, is a sweeping and many-faceted law which, among other things, outlaws the Communist Party and creates various individual criminal offenses, each punishable by imprisonment for up to 20 years. Section 9 authorizes the issuance of a warrant "for the purpose of searching for and seizing any books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings, or any written instruments showing that a person or organization is violating or has violated any provision of this Act." The section sets forth various procedural requirements, among them that "if the premises to be searched constitute a private residence, such application for a search warrant shall be accompanied by the affidavits of two credible citizens."

The application for the warrant was filed in a Bexar County court by the Criminal District Attorney of that County. It recited that the applicant

". . . has good reason to believe and does believe that a certain place and premises in Bexar County, Texas, described as two white frame houses and one garage, located at the address of 1118 West Rosewood, in the City of San Antonio, Bexar County, Texas, and being the premises under the control and in charge of John William Stanford, Jr., is a place where books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments

concerning the Communist Party of Texas, and the operations of the Communist Party in Texas are unlawfully possessed and used in violation of Articles 6889–3 [1] and 6889–3A, Revised Civil Statutes of the State of Texas, and that such belief of this officer is founded upon the following information:

"That this officer has received information from two credible persons that the party named above has such books and records in his possession which are books and records of the Communist Party including party lists and dues payments, and in addition other items listed above. That such information is of recent origin and has been confirmed by recent mailings by Stanford on the 12th of December, 1963 of pro-Communist material."

Attached to the application was an affidavit signed by two Assistant Attorneys General of Texas. The affidavit repeated the words of the application, except that the basis for the affiants' belief was stated to be as follows:

"Recent mailings by Stanford on the 12th of December, 1963, of material from his home address, such material being identified as pro-Communist material and other information received in the course of investigation that Stanford has in his possession the books and records of the Texas Communist Party."

The district judge issued a warrant which specifically described the premises to be searched, recited the allegations of the applicant's and affiants' belief that the premises were "a place where books, records, pamphlets,

---

[1] Article 6889–3 of the Revised Civil Statutes of Texas, enacted in 1951 and known as the Texas Communist Control Law, provides, among other things, that various people and organizations defined by the law who fail to register with the Texas Department of Public Safety are guilty of criminal offenses punishable by imprisonment of up to 10 years.

cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas are unlawfully possessed and used in violation of Article 6889–3 and Article 6889–3A, Revised Civil Statutes of the State of Texas," and ordered the executing officers "to enter immediately and search the above described premises for such items listed above unlawfully possessed in violation of Article 6889–3 and Article 6889–3A, Revised Civil Statutes, State of Texas, and to take possession of same."

The warrant was executed by the two Assistant Attorneys General who had signed the affidavit, accompanied by a number of county officers. They went to the place described in the warrant, which was where the petitioner resided and carried on a mail order book business under the trade name "All Points of View." [2] The petitioner was not at home when the officers arrived, but his wife was, and she let the officers in after one of them had read the warrant to her.

After some delay occasioned by an unsuccessful effort to locate the petitioner in another part of town, the search began. Under the general supervision of one of the Assistant Attorneys General the officers spent more than four hours in gathering up about half the books they found in the house. Most of the material they took came from the stock in trade of the petitioner's business, but they took a number of books from his personal library as well. The books and pamphlets taken comprised approximately 300 separate titles, in addition to numerous issues of several different periodicals. Among the books taken were works by such diverse writers as Karl Marx, Jean Paul Sartre, Theodore Draper, Fidel Castro, Earl

---

[2] The petitioner had obtained a certificate to transact business under this trade name in accordance with the Texas "Assumed Name Law."

Browder, Pope John XXIII, and Mr. Justice Hugo L. Black. The officers also took possession of many of the petitioner's private documents and papers, including his marriage certificate, his insurance policies, his household bills and receipts, and files of his personal correspondence. All this material was packed into 14 cartons and hauled off to an investigator's office in the county courthouse. The officers did not find any "records of the Communist Party" or any "party lists and dues payments."

The petitioner filed a motion with the magistrate who had issued the warrant, asking him to annul the warrant and order the return of all the property which had been seized under it. The motion asserted several federal constitutional claims. After a hearing the motion was denied without opinion. This order of denial was, as the parties agree, final and not appealable or otherwise reviewable under Texas law. See *Ex parte Wolfson,* 127 Tex. Cr. R. 277, 75 S. W. 2d 440. Accordingly, we granted certiorari, 377 U. S. 989. See *Thompson* v. *City of Louisville,* 362 U. S. 199, 202–203.

The petitioner has attacked the constitutional validity of this search and seizure upon several grounds. We rest our decision upon just one, without pausing to assess the substantiality of the others. For we think it is clear that this warrant was of a kind which it was the purpose of the Fourth Amendment to forbid—a general warrant. Therefore, even accepting the premise that some or even all of the substantive provisions of Articles 6889–3 and 6889–3A of the Revised Civil Statutes of Texas are constitutional and have not been pre-empted by federal law,[3] even accepting the premise that the warrant sufficiently specified the offense believed to have been committed and was issued upon probable cause,[4] the

---

[3] See *Pennsylvania* v. *Nelson,* 350 U. S. 497.

[4] See *Aguilar* v. *Texas,* 378 U. S. 108.

magistrate's order denying the motion to annul the warrant and return the property must nonetheless be set aside.

It is now settled that the fundamental protections of the Fourth Amendment are guaranteed by the Fourteenth Amendment against invasion by the States. *Wolf v. Colorado,* 338 U. S. 25, 27; *Mapp v. Ohio,* 367 U. S. 643; *Ker v. California,* 374 U. S. 23. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized.*" (Emphasis supplied.)

These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever "be secure in their persons, houses, papers, and effects" from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer." The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbi-

482

trary claims of Great Britain. Then and there the child 'Independence was born.' " *Boyd* v. *United States*, 116 U. S. 616, 625.

But while the Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance, its roots go far deeper. Its adoption in the Constitution of this new Nation reflected the culmination in England a few years earlier of a struggle against oppression which had endured for centuries. The story of that struggle has been fully chronicled in the pages of this Court's reports,[5] and it would be a needless exercise in pedantry to review again the detailed history of the use of general warrants as instruments of oppression from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond.

What is significant to note is that this history is largely a history of conflict between the Crown and the press. It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan.[6] In later years warrants were sometimes more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or

---

[5] See *Marcus* v. *Search Warrant*, 367 U. S. 717, 724–729; *Frank* v. *Maryland*, 359 U. S. 360, 363–366 and 376–377 (dissenting opinion); see also *Boyd* v. *United States*, 116 U. S. 616.

[6] See Siebert, Freedom of the Press in England, 1476–1776, pp. 83, 85–86, 97.

the arrest and seizure of all the papers of a named person thought to be connected with a libel.[7]

It was in the context of the latter kinds of general warrants that the battle for individual liberty and privacy was finally won—in the landmark cases of *Wilkes* v. *Wood*[8] and *Entick* v. *Carrington.*[9] The *Wilkes* case arose out of the Crown's attempt to stifle a publication called The North Briton, anonymously published by John Wilkes, then a member of Parliament—particularly issue No. 45 of that journal. Lord Halifax, as Secretary of State, issued a warrant ordering four of the King's messengers "to make strict and diligent search for the authors, printers, and publishers of a seditious and treasonable paper, entitled, The North Briton, No. 45, . . . and them, or any of them, having found, to apprehend and seize, together with their papers."[10] "Armed with their roving commission, they set forth in quest of unknown offenders; and unable to take evidence, listened to rumors, idle tales, and curious guesses. They held in their hands the liberty of every man whom they were pleased to suspect."[11] Holding that this was "a ridiculous warrant against the whole English nation,"[12] the Court of Common Pleas awarded Wilkes damages against the Secretary of State. John Entick was the author of a publication called Monitor or British Freeholder. A warrant was issued specifically naming him and that publication, and authorizing his arrest for seditious libel and the seizure of his "books and papers." The King's messengers executing the warrant ransacked Entick's home for four hours and carted

[7] See Siebert, *supra*, pp. 374–376.
[8] 19 How. St. Tr. 1153 (1763).
[9] 19 How. St. Tr. 1029 (1765).
[10] See Lasson, Development of the Fourth Amendment, p. 43.
[11] II May's Constitutional History of England, 246 (Am. ed. 1864).
[12] *Id.*, at 247.

away quantities of his books and papers. In an opinion which this Court has characterized as a wellspring of the rights now protected by the Fourth Amendment,[13] Lord Camden declared the warrant to be unlawful. "This power," he said, "so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." *Entick* v. *Carrington*.[14] Thereafter, the House of Commons passed two resolutions condemning general warrants, the first limiting its condemnation to their use in cases of libel, and the second condemning their use generally.[15]

This is the history which prompted the Court less than four years ago to remark that "[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new." *Marcus* v. *Search Warrant*, 367 U. S. 717, at 724. "This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Id.*, at 729. As MR. JUSTICE DOUGLAS has put it, "The commands of our First Amend-

---

[13] "As every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the Fourth Amendment to the Constitution . . . ." *Boyd* v. *United States*, 116 U. S. 616, at 626–627.

[14] 19 How. St. Tr., at 1064.

[15] See XVI Hansard's Parliamentary History of England 207 *et seq.*

ment (as well as the prohibitions of the Fourth and the Fifth) reflect the teachings of *Entick* v. *Carrington, supra.* These three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well.' " *Frank* v. *Maryland,* 359 U. S. 360, 376 (dissenting opinion),

In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude when the "things" are books, and the basis for their seizure is the ideas which they contain.[16] See *Marcus* v. *Search Warrant,* 367 U. S. 717; *A Quantity of Books* v. *Kansas,* 378 U. S. 205. No less a standard could be faithful to First Amendment freedoms. The constitutional impossibility of leaving the protection of those freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case.[17]

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron* v. *United States,*

---

[16] The word "books" in the context of a phrase like "books and records" has, of course, a quite different meaning. A "book" which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case. See *Marron* v. *United States,* 275 U. S. 192, 198–199. And in some situations books even of the kind seized here might, for purposes of the Fourth Amendment, be constitutionally indistinguishable from other goods—*e. g.,* if the books were stolen property.

[17] See pp. 479–480, *supra.*

486

275 U. S. 192, at 196. We need not decide in the present case whether the description of the things to be seized would have been too generalized to pass constitutional muster, had the things been weapons, narcotics or "cases of whiskey." See *Steele* v. *United States No. 1*, 267 U. S. 498, 504.[18] The point is that it was not any contraband of that kind which was ordered to be seized, but literary material—"books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas." The indiscriminate sweep of that language is constitutionally intolerable. To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history.

Two centuries have passed since the historic decision in *Entick* v. *Carrington*, almost to the very day. The world has greatly changed, and the voice of nonconformity now sometimes speaks a tongue which Lord Camden might find hard to understand. But the Fourth and Fourteenth Amendments guarantee to John Stanford that no official of the State shall ransack his home and seize his books and papers under the unbridled authority of a general warrant—no less than the law 200 years ago shielded John Entick from the messengers of the King.

The order is vacated and the cause remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[18] "The authority to the police officers under the warrants issued in this case . . . poses problems not raised by . . . warrants to seize 'gambling implements' and 'all intoxicating liquors' . . . . For the use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications." *Marcus* v. *Search Warrant*, 367 U. S. 717, at 731.