Lucian BELL, James Edward Wilson, and Robert E. Smith, Appellants,

v.

STATE of Alaska, Appellee.

No. 982.

Supreme Court of Alaska.

March 25, 1971.

David C. Backstrom, Asst. Public Defender, Fairbanks, Victor Carlson, Public Defender, Anchorage, for appellants.

Stephen Cooper, Dist. Atty., Thomas F. Keever, Asst. Dist. Atty., Fairbanks, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, and CONNOR, JJ.

OPINION

RABINOWITZ, Justice.

After joint trial by jury, appellants were each convicted of a single count of receiving stolen property and 13 separate counts of passing forged checks.

The prosecution's case against appellants was extremely strong. The state's evidence in part showed the following: Sometime between June 30 and July 5, 1967, 145 checks of the sort used for payrolls were stolen from the Anchorage office of the John Wayne Construction Company. Wayne Davis and John Belarde, the two officers of John Wayne Construction Company who were authorized to sign checks for the company, testified that they did not draw the 13 checks in question, that they did not authorize payment to any of the named payees appearing on the faces of these checks, and that appellants had never worked for their company. An FBI document examiner stated that the signatures of Davis and Belarde on the 13 checks were, in his opinion, forgeries.

The state introduced further evidence which showed that appellants had unsuccessfully attempted to cash a John Wayne Construction Company check at a drive-in bank in Anchorage. When offered the check, the bank teller became suspicious, checked the authorized signatures, and then refused to cash the check on the basis that the drawers' signatures were "irregular." At this same time, the teller noted the license number and type of vehicle in which appellants were waiting. In this regard the state's evidence later developed that appellant Bell had rented this vehicle from the Rent-A-Chevy car rental agency in Anchorage. There was also evidence that at the time he rented the vehicle appellant Bell used a State of Washington driver's license bearing the name of Richard Senter.

From the state's evidence it is clear that sometime shortly after this occurrence appellants left the Anchorage area and drove to Fairbanks in the automobile that Bell had rented. Thereafter, on the 7th and 8th of

July, appellants engaged in highly active check passing endeavors throughout the Fairbanks community. In passing and attempting to pass these John Wayne Construction Company checks appellants used aliases, offered nonexistent Fairbanks addresses for identification purposes, and presented other false indicia of identification. Owners and employees of several Fairbanks businesses identified one or more of the appellants as the people who attempted to cash, and in some instances successfully cashed, the John Wayne Construction Company checks in question on the 7th and 8th of July. An FBI fingerprint examiner gave testimony to the effect that appellant Bell's fingerprints or palm prints appeared on three of the checks in question while appellant Smith's fingerprints or palm prints were on 6 of the 13 checks in issue. At the time appellant Bell was arrested a John Wayne Construction Company check was found under his armpit. At this same time Bell was also found in possession of the keys to the Chevrolet Impala which had been rented in Anchorage and Richard Senter's State of Washington driver's license. Concurrent with Bell's arrest the automobile was impounded and later searched pursuant to a search warrant.

Appellants Wilson and Bell testified in their own behalf. According to their versions, appellants were all playing pool in Anchorage when they met a man named Richards who asked appellants to accompany him to Fairbanks. Bell denied having rented the Chevrolet Impala in Anchorage, and further denied using a draft card or State of Washington driver's license bearing the name Richard Senter as identification to facilitate rental of the vehicle.[1] Both Wilson and Bell denied being in any of the various Fairbanks business establishments they were said to have entered on the dates

in question, denied purchasing any of the merchandise the state's witnesses testified they purchased, and further denied any connection with the John Wayne Construction Company checks in question. Bell and Wilson also testified that certain items of merchandise they were alleged to have purchased from Fairbanks businesses with the checks in question were in fact purchased from a friend of Richards in the men's room of a downtown Fairbanks pool hall.

■ In this appeal appellants contend that the trial court's instructions pertaining to the requisite intent necessary for conviction were erroneous in that the prosecution was not required to prove that appellants intended to defraud the particular persons named in the 13 separate uttering of forged check counts. Disposition of the merits of this specification of error is controlled by our decision in Morrison v. State, 469 P.2d 125, 126–127 (Alaska 1970). There we held that under Alaska's forgery statutes it is unnecessary for the state to prove, or for the trial court to instruct the jury, that the intent to defraud a particular person is essential to conviction. In Morrison, we said that "at the trial of a forgery prosecution, it is considered sufficient if an intent to defraud any person or corporation is established." We further stated that the naming of particular persons in the body of the indictment was, under Alaska's forgery statutes, normally surplusage. Study of the record in the case at bar fails to reveal that any substantial rights of the appellants were adversely affected because of the trial court's failure to instruct that it was necessary for the state to prove that appellants intended to defraud the particular persons named in the indictment. We therefore hold that the trial court did not err in its instructions pertaining to intent.[2]

---

1. Bell stated to an officer at the time of arrest that he obtained two Selective Service cards bearing the name Richard Senter and the Washington driver's license bearing Richard Senter's name from a fellow with whom he was shooting pool.

2. The jury was instructed that in order to convict they had to find that appellants had passed the checks with intent to defraud "another."

Appellants next assert that the trial court committed error when it refused to grant their motion to suppress certain items of clothing, jewelry, and men's accessories which were obtained as a result of a search made of the vehicle which Bell had rented in Anchorage. Subsequent to the arrest of appellants on the 8th of July, the vehicle was impounded by the Fairbanks police department for illegal parking and pursuant to the request of the Anchorage car rental agency to retain the vehicle.[3] At the suppression hearing which was held during the trial, the state's evidence showed that on July 10, 1967, Sergeant Tannenbaum of the city of Fairbanks Police Department searched Bell's impounded vehicle pursuant to a search warrant. The warrant authorized a search of the vehicle for "certain payroll checks No. 2606 through 2750 stolen or embezzled from the John Wayne Construction Company." Officer Tannenbaum testified that he conducted this search in the presence of appellant Bell, and that the search failed to uncover any payroll checks. Tannenbaum further testified that during the course of his search of the vehicle he observed clothing, jewelry cases, and cosmetics contained in black plastic bags in the trunk of the car. Tannenbaum said that these items were not seized at that time but were subsequently seized pursuant to a search warrant which was obtained the next day, July 11. Officer Tannenbaum further stated that appellant Bell was also present at the time the items were seized from the vehicle under authorization of the second warrant.[4]

Appellant Bell testified that on July 10, 1967, he was shown a search warrant which permitted a search of the vehicle for checks of the John Wayne Construction Company. Bell claims that the items of clothing, deodorant, cologne, and jewelry were seized from the trunk of the car during this first search of the vehicle which occurred on July 10, 1967. Bell denied having ever been out of jail on July 11, and further denied having witnessed a second search of the vehicle.[5]

The trial court held that the items in question were admissible on the grounds that the search of the vehicle was "overall" reasonable because the police had authority to search the vehicle and remove items therefrom as part of their inventory procedures pertaining to impounded vehicles, that appellants' motion to suppress was untimely because appellants should have moved to suppress before trial, and that appellants lacked standing to object to the seizure. In so ruling, the trial court refused to resolve the credibility issue relating to the conflicting testimony of appellant Bell and Officer Tannenbaum concerning the second search warrant and the search purportedly conducted under that warrant.

On appeal the state concedes that appellants had standing to contest the search and seizure in question. The state also concedes that as the record stands, the search and seizure must be treated as having taken place as Bell alleged, that is under the first warrant which only authorized a search for checks.

Both the Fourth Amendment to the United States Constitution and article I, section 14 of the Alaska Constitution provide, in regard to searches and seizures, that:

[N]o warrants shall issue, but upon probable cause, supported by oath or affirma-

---

3. The keys to this vehicle were found on the person of Bell at the time he was booked into the police station.

4. The record reflects that a second search warrant was issued in this case to search Bell's vehicle. This second warrant authorized a search of the vehicle for,
Bill for $161.65 for purchase of nugget watch band and watch, Bill #61521; Two pair glasses possibly bearing fingerprints; Bottle possibly bearing fin-

gerprints; numerous suits of clothes; wallet with I. D. of Thomas S. Nichols; Several Bottles of cologne; Empty watch boxes and jewelry boxes, some with cuff links; Bill #61522 for watch band for $98.00 and other jewelry.

5. Appellant Bell further testified he received a receipt for the items which were taken on July 10, but that due to the Fairbanks flood this receipt was no longer available.

tion, and particularly describing the place to be searched, and the persons or things to be seized.

In Stanford v. Texas, 379 U.S. 476, 481, 85 S.Ct. 506, 509, 13 L.Ed.2d 431, 435 (1965), the Supreme Court of the United States alluded to the origin of the Fourth Amendment's proscription against unreasonable searches and seizures, saying:

These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists.

It is against this historical background that Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), becomes significant.[6] Marron concerned the execution of a search warrant for intoxicating liquors and articles for their manufacture. Upon entering the defendant's premises, the officers observed liquor being illegally served and immediately placed the person in charge under arrest. The officers then proceeded to search the premises, and seized a large quantity of liquor as well as business ledgers and bills. In Marron,[7] the de-

fendant contended that the seizure of the ledgers and bills could not be justified under the search warrant then in question. The Supreme Court agreed, saying:

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

More recently the Supreme Court, in Trupiano v. United States, 334 U.S. 699, 710, 68 S.Ct. 1229, 1235, 92 L.Ed. 1663, 1672 (1948), said that:

A search warrant must describe with particularity the place to be searched and the things to be seized. Without such a warrant, however, officers are free to determine for themselves the extent of their search and the precise objects to be seized. This is no small difference. It is the difference upon which depends much of the potency of the right of privacy.

■ It is thus clear that the object of the clause of the Fourth Amendment requiring particularity in regard to the article to be seized under the search warrant is to prevent overbroad generalized searches and seizures. By way of implementation of Alaska's comparable constitutional proscription against unreasonable searches and

6. The historical antecedents of the Fourth Amendment were explored by Justice Bradley in Boyd v. United States, 116 U.S. 616, 624, 6 S.Ct. 524, 529, 29 L.Ed. 746, 749 (1886). There he said:

In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms "unreasonable searches and seizures," it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the Colonies, of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced "the worst instrument

of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book;" since they placed "the liberty of every man in the hands of every petty officer."

See also Mr. Justice Day's opinion in Weeks v. United States, 232 U.S. 383, 391–392, 34 S.Ct. 341, 58 L.Ed. 652, 655 (1914).

7. Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231, 237 (1927). Marron was cited with approval in Berger v. New York, 388 U.S. 41, 58, 87 S.Ct. 1873, 18 L.Ed.2d 1040, 1052 (1967). See also Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

seizures, this court promulgated subsection (3) of Criminal Rule 37(c) which states that a person aggrieved by an unlawful search and seizure may move to suppress for use as evidence anything so obtained on the ground that "the property seized is not that described in the warrant * * *." [8]

Since *Marron* was decided, federal courts have carved out numerous exceptions to the general rule requiring particularity.[9] In Johnson v. United States, 110 U.S.App. D.C. 351, 293 F.2d 539, 540 (1961), Judge Burger (now Chief Justice) said:

> An officer engaged in a lawful search is not confined to seizing only those items described in the warrant, especially where the unlisted items seized are instrumentalities of a crime.

Other exceptions to the general rule of *Marron* that only those things described in the search warrant may be seized have been recognized. Some of these are: officers can seize articles bearing a reasonable relation to the purpose of the search, Mesmer v. United States, 405 F.2d 316, 319 (10th Cir. 1969); officers can seize property which shows that a different offense is being committed in the presence of the police, United States v. Baldwin, 46 F.R.D. 63, 65 (S.D.N.Y.1969); an item may be so closely related to items detailed in the search warrant as to justify seizure, that is, where it is an instrumentality for commission of the "crime involved," United States

v. One 1965 Buick, 392 F.2d 672, 679 (6th Cir. 1968).[10]

In Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), the defendant was convicted of unlawful possession, concealment, and alteration of Selective Service documents. Incriminating documents were discovered in the course of a search incident to an arrest warrant for mail fraud violations. Defendant's conviction was upheld by the Supreme Court in an opinion which found that the objects discovered were properly subject to seizure. Several federal courts have regarded *Harris* as articulating an exception to the rule of *Marron*.[11] The language of *Harris* which has been relied upon is the following:

> In the present case the agents were in possession of facts indicating petitioner's probable guilt of the crimes for which the warrants of arrest were issued. The search was not a general exploration but was specifically directed to the means and instrumentalities by which the crimes charged had been committed * * *. [T]he agents conducted their search in good faith for the purpose of discovering the objects specified. * * Nothing in the agents' conduct was inconsistent with their declared purpose. [331 U.S. at 153, 67 S.Ct. at 1102, 91 L. Ed. at 1407.]

---

8. *Compare* Fed.R.Crim.P. 41(e).

9. *See* United States v. Baldwin, 46 F.R.D. 63, 65 (S.D.N.Y.1969).

10. *Conflicting interpretations of Marron* have followed in the wake of Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), abolishing the "mere evidence" rule in search and seizure cases. *Compare* United States v. Alloway, 397 F.2d 105 (6th Cir. 1968), *with* People v. Baker, 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232 (1968).

  In *Hayden*, the Supreme Court said: The 'mere evidence' limitation has spawned exceptions so numerous and confusion so great, in fact, that it is questionable whether it affords meaningful protection. But if its rejection

does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause and particularity requirements of the Fourth Amendment and after the intervention of 'a neutral and detached magistrate. * * *' The Fourth Amendment allows intrusions upon privacy under these circumstances, and there is no viable reason to distinguish intrusions to secure 'mere evidence' from intrusion to secure fruits, instrumentalities, or contraband. (citations omitted).
Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 309–310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782, 793–794 (1967).

11. Gurleski v. United States, 405 F.2d 253, 257 (5th Cir. 1968).

We think the rationale of *Harris* is equally applicable to the case where the search and seizure is carried out under the authority of a lawful search warrant.[12] We can perceive no logical or constitutional reason, given a lawful entry pursuant to a search warrant by an officer who is conducting a good faith search, why the officer conducting the search should be prohibited from seizing evidence not described in the search warrant where the searching officer has a reasonable basis for drawing a connection between the observed evidentiary objects and the crime which formed the basis of the search warrant.[13] We think it unrealistic in such circumstances to require the officer to obtain a second search warrant, particularly in a case where the location of the objects are already known and have for all practical purposes effectively been seized by the officer.

We therefore hold that an officer may seize evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the searching officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the authorized perimeters of the search warrant.[14]

We indicated earlier that the trial court declined to resolve the credibility issues which arose from the conflicting testimony of appellant Bell and Officer Tan-

nenbaum concerning the second search warrant and the seizures made pursuant to the second warrant. In view of the circumstances of this record, we believe a remand to the superior court is appropriate for the purpose of permitting additional findings to be made regarding appellants' suppression motion and for the further purpose of conducting such additional suppression hearings as are deemed appropriate. More specifically, the superior court, upon remand, is to determine whether or not the items in question were seized pursuant to the second search warrant. In the event the trial court concludes that the property was seized during the initial search of Bell's vehicle under the first warrant, then the trial court shall determine whether the objects seized were reasonably related to the offenses in question, whether the searching officer at the time of the seizure had a reasonable basis for connecting the observed objects and the crimes which furnished the basis for the search warrant, and whether the discovery of the property in question was made in the course of a good faith search conducted within the authorized perimeters of the first search warrant.

Decision upon appellants' assertion of error in regard to the trial court's admission of certain evidence regarding handwriting exemplars obtained prior to trial is deferred until completion of the remand proceedings ordered herein.

Remanded in accordance with the foregoing.

ERWIN, J., not participating.

12. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), modified *Harris* only in delineation of the physical area which may be searched.

The *Harris* rationale has been followed in the following cases: Seymour v. United States, 369 F.2d 825 (10th Cir. 1966); United States v. Eisner, 297 F.2d 595 (6th Cir. 1962); Johnson v. United States, 110 U.S.App.D.C. 351, 293 F.2d 539 (1961); Bryant v. United States, 252 F.2d 746 (5th Cir. 1958).

13. *See* Judge Goldberg's opinion in Gurleski v. United States, 405 F.2d 253, 257 (5th Cir. 1968). *See also* United States ex rel. Chambers v. Maroney, 408 F.2d 1186, 1194–1195 n. 26 (3d Cir. 1969).

14. *See* United States v. McDonnell, 315 F.Supp. 152, 166–169 (D.Neb.1970).