**Michael J. ANDERSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2406.**

Supreme Court of Alaska.

Oct. 8, 1976.

---

252

Frank S. Koziol, Jr., Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

Stephen G. Dunning and Ivan Lawner, Asst. Dist. Attys., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

BURKE, Justice.

During the month of April, 1974, Michael J. Anderson became a subject of interest to two local law enforcement agencies. The Juvenile Bureau of the Anchorage City Police Department had become aware of Anderson's sexual attraction for young boys and, at the same time, the Metropolitan Drug Unit (Metro) had acquired information concerning his use of illegal drugs.[1] On April 18, 1974, seven law enforcement officers, from both agencies, visited Anderson's home in Anchorage equipped with two warrants. The officers from the city's Juvenile Bureau carried a warrant for Anderson's arrest on a charge of Lewd and Lascivious Acts Toward a Child.[2] The officers from Metro were

---

1. This information concerned Anderson's use of marijuana for which, in April, 1974, a criminal penalty was still provided in Alaska.

2. AS 11.15.134 provides:

 (a) A person who commits a lewd or lascivious act, including an act constituting another crime, upon or with the body of a child under 16 years of age, intending to arouse, appeal to, or gratify his lust, passions, or sexual desires, or the lust, passions, or sexual desires of the child is punishable by imprisonment for not more than 10 years nor less than one year.

 (b) No court may suspend the sentence of a person convicted of violating (a) of this

armed with a warrant authorizing them to search Anderson's home for marijuana and related paraphernalia.[3]

Upon their arrival at Anderson's small, one-room apartment, Investigator Edward Harter, of Metro, knocked on the door and advised Anderson of the search warrant. Anderson admitted the police officers and was immediately arrested by one of the Juvenile Officers, Donald Earl. While two officers escorted Anderson downtown to be booked, four officers from Metro and Investigator Earl, of the Juvenile Bureau, remained in his apartment to execute the search warrant. During the course of his search, Investigator Harter observed an object hanging from the ceiling in the apartment. He identified it as a strip of black-and-white photographic negatives and moved it toward either the wall or the window to determine its contents. Harter claims to have observed a pipe in one of the frames. Officer Needham, also from Metro, held this same strip of negatives to the light and observed a pipe and what appeared to him to be marijuana.

Shortly thereafter, Investigator Jones, of Metro, observed a slide projector with a number of slides [4] in its tray on a shelf on the west wall of the room. He took the projector and slides down from the shelf and examined them. He scrutinized the slides by holding each one to the light. The slides revealed images of nude, male children.

Shortly thereafter, Investigator Needham found another stack of slides, about three quarters of an inch thick, lying without a container on another shelf. Like Investigator Jones, Needham scrutinized the slides by holding each one to the light. Needham also found his batch of slides to contain images of nude, male children. During the remainder of the search, thirty-three items, in addition to the slides, were seized by the officers including a driver's license, a quantity of marijuana, a poster of a young boy and girl, a slide projector, a portable calculator, several books, and a stack of assorted comic books. By printing the negatives which they had seized, the police officers were able to obtain the identities of the boys depicted in the slides.

Anderson was subsequently charged with lewd and lascivious acts toward a child[5] and with contributing to the delinquency of a minor.[6] The boys, who were 16 and 13 years of age, became the state's chief witnesses against Anderson in these proceedings, testifying that he had performed acts of oral copulation upon each of them. He was convicted in a court trial and sentenced to two years on the "contributing" charge and to six years on the "lewd and

section until the court obtains a report from a reputable psychiatrist stating the mental condition of the person. No paroling authority may parole a person convicted of violating (a) of this section until the paroling authority receives a report from a reputable psychiatrist stating the mental condition of the person and stating that the person was under observation while confined in prison.

The charges which provided the basis for this arrest warrant are unrelated to this appeal. At the time of his arrest on April 18, 1974, by Juvenile Officers, law enforcement officials were unaware of the acts which ultimately led to the conviction from which Anderson now appeals.

3. The exact description of the items to be seized under the warrant was:

. . . quantity of the unlawful drug cannabis or marijuana, together with pipes, plastic baggies and other paraphernalia for the packaging and use of said drug.

4. The slides which were observed and subsequently seized were actually photographic negatives which had been mounted, as slides, in cardboard holders. While we refer to the items as "slides" throughout this opinion, they were unlike ordinary slides in that they presented negative images, more difficult to discern.

5. AS 11.15.134 (see note 2, *supra*).

6. AS 11.40.130(b) provides:

(b) A person who by threats, command or persuasion endeavors to induce a child under the age of 18 years to perform an act or follow a course of conduct which would cause or manifestly tend to cause him to become or remain a delinquent is guilty of a felony, and upon conviction is punishable by imprisonment for not less than one year nor more than two years.

lascivious" charge, to be served consecutively. Anderson has pursued this appeal contending that the trial court erred in failing to suppress the photographic slides, and evidence obtained therefrom. He asserts that the evidence was obtained in violation of his constitutional rights under the Fourth[7] and Fifth[8] Amendments to the United States Constitution and Article I, Sections 14[9] and 22,[10] of the Alaska Constitution. Anderson has also appealed, as excessive, the sentence imposed by the trial court.

 The state has asserted, and the trial court adopted, the position that the slides were properly admitted at trial as within the "plain view" exception to the warrant requirement.[11] Anderson contends, however, that the slides were not within the plain view of the officers, nor did the search warrant, which authorized a search of his home for marijuana and related items, permit their seizure. Thus, Anderson concludes that the trial court erred in failing to suppress both the slides and the evidence obtained therefrom.[12] We must first resolve the following issue: Did a search occur when the officers lifted the slides to the light or were the slides, and their contents, within the plain view of the officers?

We have provided, in prior cases, a definition of the type of police intrusion which will constitute a search. In *Brown v. State*[13] we stated that

. . . the term [search] implies some exploratory investigation or an invasion and quest, a looking for or seeking out. The quest may be secret, intrusive or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little. A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way.

 Several prior Alaska and United States Supreme Court cases provide an analytical framework within which we may examine the intrusion by the police officers in lifting Anderson's slides to the light for scrutiny and determine whether such action constituted a "prying into hidden places for . . . [an] object [which]

---

7. United States Constitution, Fourth Amendment provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

8. United States Constitution, Fifth Amendment provides, in part:
 [No person] shall be compelled in any criminal case to be a witness against himself . . .

9. Alaska Constitution, Article I, section 14 provides:
 The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

10. Alaska Constitution, Article I, section 22 provides:
 The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

11. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Davenport*, 510 P.2d 78 (Alaska 1973); *Bell v. State*, 482 P.2d 854 (Alaska 1971); *Pope v. State*, 478 P.2d 801 (Alaska 1970); *Klockenbrink v. State*, 472 P.2d 958 (Alaska 1970); *Stevens v. State*, 443 P.2d 600 (Alaska 1968).

12. If the slides were seized in violation of the defendant's constitutional rights, any evidence derived therefrom would also be inadmissible as a "fruit of the poisoned tree". See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Erickson v. State*, 507 P.2d 508 (Alaska 1973).

13. 372 P.2d 785, 790 (Alaska 1962), quoting from *People v. West*, 144 Cal.App.2d 214, 300 P.2d 729, 733 (1956).

has been hidden . . .", in other words, a search. The United States Supreme Court outlined in *Katz v. United States*[14] the protection afforded by the Fourth Amendment to the United States Constitution.

> The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. (citation omitted) But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.[15]

*Terry v. Ohio*[16] elaborated on this theme, quoting the "expectation of privacy" test first enunciated in *Katz*: [17]

> . . . and wherever an individual may harbor a reasonable "expectation of privacy," id., at 361, 88 S.Ct. at 516, he is entitled to be free from unreasonable governmental intrusion.[18]

We adopted these principles in *Smith v. State*[19], in which Justice Connor, writing for the majority, applied the test first articulated by Mr. Justice Harlan in his concurrence in *Katz*[20] for determining the existence of a "reasonable expectation of privacy". We required

> . . . first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."[21]

Taking these principles in hand, we must analyze and weigh two independent considerations: first, we must scrutinize the governmental intrusion which resulted in the seizure of the slides; and second, we must examine the expectation of privacy which Michael Anderson had in those slides.

Police intrusions upon the privacy of private citizens span a broad spectrum of activity. At one end of the spectrum lie the pryings into hidden places which are constitutionally condemned. At the other end of the spectrum lies the seizure of items which are knowingly exposed to the public and are in plain view. We must examine the conduct and the police officers here and determine which of these two terminal points best characterizes the intrusion here.

■ Under the "plain view" doctrine, certain evidence may be seized without the procuring of a warrant. Police officers need not turn their backs on evidence, instrumentalities, or fruits of a crime which are inadvertently discovered.[22] Anderson's slides, however, were not "seizable" while they were stacked in the projector, lying on the shelf, or in the hands of the officers. At all of these points in time the slides were innocuous. They did not appear to be either evidence, instrumentalities, or fruits of a crime. It was only after they were held to the light that any incriminating quality of the slides was discerned. Thus, the core issue which is presented here involves how much movement, probing or testing of an apparently innocuous object, aimed at uncovering an

14. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967).

15. *Id.* at 351–352, 88 S.Ct. at 511.

16. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

17. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

18. 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889.

19. 510 P.2d 793 (Alaska 1973).

20. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

21. *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973), quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–588 (1967).

22. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Davenport*, 510 P.2d 78 (Alaska 1973); *Bell v. State*, 482 P.2d 854 (Alaska 1971); *Pope v. State*, 478 P.2d 801 (Alaska 1971); *Klockenbrink v. State*, 472 P.2d 958 (Alaska 1970); *Stevens v. State*, 443 P.2d 600 (Alaska 1968).

incriminating characteristic, is permitted. The appellant contends that the scrutinizing of the slides by the officers, by lifting them to the light, constituted a "prying into hidden places". The state disputes the contention that the lifting of the slides to the light constituted an intrusion or search separate from that which was authorized by the warrant. The state asserts that the examination of the slides was not an intrusion of sufficient magnitude to rise to the level of a search. Since the slides were within the view of the officers, the state argues, they were seizable.

We have used the "plain view" doctrine in several previous cases, holding that no search occurs when an item falls into view of an officer.[23] But in all of these cases the incriminating quality of the item subsequently seized was readily apparent and required no movement of either the observer or the observed object to detect. In *Erickson v. State*[24] we held that marijuana which had been removed by officers from a suitcase could not be held to have been in plain view, hence, a violative search occurred. Quoting Justice Traynor of the Supreme Court of California we said:

> It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents.[25]

Like the opaque container about which Justice Traynor wrote in *People v. Marshall*,[26] and like the suitcase in *Erickson v. State*,[27] Anderson's slides required some movement, some probing by the officers, before any incriminating quality could have been disclosed.

In *Daygee v. State*[28] the officer shined his flashlight into the rear of an automobile which he had stopped. In the back seat he observed a plastic bag which he suspected contained marijuana. Daygee contended that the shining of the flashlight constituted an unreasonable search, thus removing the "plain view" protection from the warrantless seizure. Writing for the majority, Justice Erwin rejected that argument stating:

> It is no search to observe that which is in the plain view of an officer who is rightfully in a position to have that view. That the officer's view in this case was aided by a flashlight is irrelevant. The flashlight beam merely illuminated that which would have been visible in the light of day.[29]

Several distinctions, however, which are admittedly finely drawn, dissuade us from extending the reasoned decision of *Daygee v. State, supra,* to the seizure of Anderson's slides.

Unlike the bag of marijuana in *Daygee* which would have been visible in the light of day, the slides seized by the officers here were equally innocuous in day or night. The slides were in an open tray on a shelf on a wall of the room. There was nothing about them to suggest that they contained marijuana or drug paraphernalia as set forth in the search warrant. "But

23. *Daygee v. State,* 514 P.2d 1159 (Alaska 1973), in which a plastic bag of marijuana was observed by officers in an automobile; *Pope v. State,* 478 P.2d 801 (Alaska 1970), in which a gun was observed by officers on the seat of an automobile; and *Klockenbrink v. State,* 472 P.2d 958 (Alaska 1970), in which illegal salmon fishing was observed by officers. *But see State v. Spietz,* 531 P. 2d 521 (Alaska 1975), in which a tub of marijuana was observed by officers.

24. 507 P.2d 508 (Alaska 1973).

25. *Id.* at page 513, quoting from *People v. Marshall,* 69 Cal.2d 51, 69 Cal.Rptr. 585, 442 P.2d 665, 669 (1968). *See also People*

*v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975).

26. 69 Cal.2d 51, 69 Cal.Rptr. 585, 442 P. 2d 665 (1968).

27. 507 P.2d 508 (Alaska 1973).

28. 514 P.2d 1159 (Alaska 1973).

29. *Id.* at 1162. This approach, with respect to illumination by flashlight, is taken by nearly all courts. *See,* in accord, *People v. Boileau,* 538 P.2d 484 (Colo.App.1975); *United States v. Johnson,* 506 F.2d 674 (8th Cir. 1975); *United States v. Lewis,* 504 F.2d 92 (6th Cir. 1974); *Cobb v. Wyrick,* 379 F. Supp. 1287 (D.C.Mo.1974).

for" the action of the officers in lifting them to the light, the incriminating nature of the slides would not have been revealed. The activity by the police officers here falls, analytically, between the opening of the suitcase in *Erickson* and the shining of the flashlight in *Daygee*. While in each of these cases the incriminating nature of the items eventually seized required some action on the part of the officers to be revealed[30] we found the conduct of the police in *Erickson* to be violative while in *Daygee*, we found the officer's actions permissible.

■ The "plain view" doctrine was examined by the United States Supreme Court in *Coolidge v. New Hampshire*[31]. In the majority opinion Mr. Justice Stewart articulated the "immediately apparent" test which sets the constitutional limitations to the "plain view" doctrine.

> Of course, the extension of the original justification [for an intrusion] is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.[32]

In the course of executing the search warrant for marijuana, the officers here found themselves probing a slide projector and a stack of slides for the contraband substance. At that point it was not "immediately apparent" to them that the slides were evidence, instrumentalities or fruits of a crime. It was only after they probed further, straying from the directives of the warrant, and held the slides to the light,

that incriminating evidence of another crime fell into view.

In *Stanley v. Georgia*[33] police officers entered the defendant's home to execute a search warrant for evidence of an illegal gambling business. Three reels of 8mm film were found in the bedroom and were viewed, by the officers, with a projector and screen which were available. The films, found to be obscene, were seized and the defendant was convicted under a Georgia obscenity statute. Mr. Justice Stewart, in his concurring opinion, found the search to have violated the defendant's constitutional rights. He stated:

> This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence in plain view. For the record makes clear that the contents of the films could not be determined by mere inspection.[34]

■ Thus, *Stanley* gives us still another point on the spectrum of police intrusions. Having weighed carefully the principles enunciated in these cases and the protection afforded by the Alaska and United States Constitutions, we are of the view that the warrantless seizure of Anderson's slides by the police officers cannot be sustained as having been within the spirit of the "plain view" doctrine.

Had the slides been left where they were found, or had the inspection of the slides been limited to one designed to uncover the type of evidence described in the warrant, marijuana and related paraphernalia, the incriminating quality of the slides would not have been detected.[35] A similar situa-

---

30. As with flashlight observations, courts have had little difficulty sustaining the warrantless seizure of items observed in plain view with the assistance of binoculars. *See*, for example, *United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Johnson v. State*, 2 Md.App. 300, 234 A.2d 464 (1967); *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970); *People v. Ciochon*, 23 Ill.App.3d 363, 319 N.E. 2d 332 (1974); and *People v. Vermouth*, 42 Cal.App.3d 353, 116 Cal.Rptr. 675 (1974).

31. 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

32. *Id.* at 466, 91 S.Ct. at 2038.

33. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

34. *Id.* at 571, 89 S.Ct. at 1251.

35. Contrast this situation with, for example, that presented in *State v. Davenport*, 510 P.2d 78, 83 (Alaska 1973) in which the officers, who were searching for guns, had rea-

tion occurred in a Texas case, *Nicholas v. State*.[36] There officers entered the defendant's home to arrest him for being a fugitive from another state. Before leaving, an officer walked to the kitchen to turn off a stove which he had noticed was turned on. On his way he observed, on a bar between the living room and the kitchen, numerous photographic negatives. Like the slides found in Anderson's apartment, these negatives were innocuous until they were held to the light by the officer; and like Anderson's slides, they, too, depicted aberrant sexual conduct.

Relying on the "immediate apparent" language in *Coolidge v. New Hampshire, supra,* the Texas court held that the slides were not lawfully seized in "plain view" because the incriminating quality was only detected after the officer held them to the light. That action, the court stated, constituted an unlawful warrantless search.

> In the instant case, the officers had, prior to their examining the negatives, neither knowledge nor mere suspicion of an offense related to the film. What was in "plain view" in the apartment was not evidence of any crime or criminal behavior. It was not contraband or fruits or instrumentalities of any offense about which they knew or suspected upon entering the apartment. *The officers did not inadvertently come across a piece of evidence incriminating the accused. The negatives were not incriminating until after the officers had examined them. Thus, it was not "immediately apparent" to the officers that they had evidence before them.*[37]

We find ourselves in agreement with the Texas court on this point. The seizure of Anderson's slides can not be sustained as within the "plain view" doctrine. The incriminating nature of the slides was not immediately apparent to the officers executing the search warrant. Their action,

in lifting the slides to the light to examine their contents, constituted a search of constitutional dimensions.

We recognize that the law of search and seizure is complex and often difficult to apply. That the permutations of human behavior sometimes carry police officers into situations which demand decisions close to the line of unconstitutional instrusions is, perhaps, an inevitability. But the rights and liberties secured by the federal and state constitutions are paramount and they will be protected.

The insertion of the Fourth Amendment into our constitutional scheme reflected a reaction by the framers to the proliferation of writs of assistance which were in common use by the English courts. The violation of personal liberty and dignity manifested by the widespread use of such writs, in which broad discretion was delegated to law enforcement officials in exercising searches and seizures of private property, was deemed deeply offensive to the emerging sense of American democracy. Thus, the Fourth Amendment created a barrier between the citizen and his government, protecting him from unreasonable searches and seizures. The general search, in which police officers moved from one object to the next in search of unidentified incriminating evidence, was prohibited; warrants, issued upon a proper showing of probable cause and particularly describing the items to be seized, set the constitutional limits to police intrusions into the lives of the citizenry.

While the action of the police officers here in examining Anderson's slides may be viewed by some as only a small deviation from the constitutional standard, we feel no less moved to condemn such action here than we would were the intrusion by the police officers of an obviously greater magnitude. As Mr. Justice Bradley eloquently stated in *Boyd v. United*

---

sonable grounds to believe that furs which they discovered were the fruit of a crime.

36. 502 S.W.2d 169 (Tex.Cr.App.1973).

37. *Id.* at 172 (emphasis added, footnotes omitted).

*States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886),

. . . illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes or procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.

We, of course, do not condone the behavior of the appellant, and we share the agony which undoubtedly befell the parents of the children who were victimized. But, we are mindful of Mr. Justice Frankfurter's observation that cases presenting issues of constitutional rights frequently involve people who have committed the most appalling of violations. He stated:

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people.[38]

The "plain view" doctrine is a court-created exception to the warrant requirement. Its basis is in logic and we do not mean to undermine this cornerstone of the "search and seizure" framework; rather, the doctrine is reaffirmed. But we will not pull and stretch the doctrine to cover a wide range of police activity which is best characterized as unconstitutionally excessive. To the extent that seizable items are observed within the plain view of an officer who is lawfully in a place from which those items may be observed, they may be seized. We construe the words "plain view", however, in their most literal sense. As stated in *Bell v. State,* 482 P.2d 854, 860 (Alaska 1971):

[A]n officer may seize evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the searching officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the authorized perimeters of the search warrants. (footnotes omitted)[39]

That we find that the slides were not in plain view does not completely dispose of this issue. As indicated above, there is also the requirement that Anderson have had a "reasonable expectation of privacy" in the items or areas searched before the seizure will be invalidated.

Taking the two-pronged test which we adopted in *Smith v. State, supra,* we must inquire whether Anderson exhibited an actual, subjective expectation of privacy with respect to his slides and whether that expectation was reasonable. With respect to the first part of this test there is substantial evidence from which it can be concluded that Anderson did exhibit an actual expectation of privacy in his slides. Anderson had stored his slides on a shelf in his one-room apartment. Indeed, the shelves may have been one of the few places in his home in which objects intended to remain private could be stored. We believe this to be sufficient evidence of his subjective expectation that the slides would remain private.

The expectation of privacy must also be one which will be recognized as "reasonable".[40] That we should recognize that the expectation of privacy retained in photographic slides stored on a shelf in

---

**38.** *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653, 662 (1949).

**39.** *See also State v. Davenport,* 510 P.2d 78 (Alaska 1973).

**40.** *Smith v. State,* 510 P.2d 793, 797 (Alaska 1973). *See also Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 899 (1968) ; *United States v. White,* 401 U.S. 745, 751–52, 91 S.Ct. 1122, 1125–1126, 28 L.Ed.2d 453, 458–59 (1971).

one's home is "reasonable" is little more than axiomatic given the language of both the federal and state constitutions and our previous comments in this area. The Fourth Amendment to the United States Constitution specifically enumerates houses, papers, and effects as being protected from unreasonable searches and seizures.[41] Section 14 of Article I of the Alaska Constitution provides similar protection.[42] In *Smith v. State, supra* we observed, without deciding, that a trash barrel stored close to one's home might be subject to a "reasonable expectation of privacy".[43] Additional protection is found in the "right to privacy" clause[44] of the state constitution which requires that the right to privacy in one's home be preserved.

Thus, we have no difficulty in recognizing, as reasonable, the expectation of privacy retained in photographic slides stored on a shelf in one's home. We cannot accept the state's contention that any expectation of privacy Anderson harbored in his personal effects was obliterated by the search warrant which authorized the officers to examine his home and its contents. We believe that Anderson's rights and expectations of privacy were limited only to the extent necessary to properly execute the search warrant. While the warrant permitted an intrusion of substantial magnitude, given the infinite number of places marijuana could be stored, it did not provide authorization for the "general" search

which is constitutionally abhorred.[45] We believe that Anderson retained a reasonable expectation of privacy in all areas of his home and all of his papers and effects which were not a proper object of a search for the items identified in the warrant.

■■■■■ We further conclude that the warrant authorizing the police officers to search for marijuana, pipes, baggies and paraphernalia for packaging and use of marijuana, did not authorize the officers to engage in conduct such as the searching of Anderson's slides by lifting them to the light. The police officers were limited in their search to places reasonably likely to reveal items enumerated in the warrant. As we stated in *Bell v. State*[46], the requirement that warrants particularly describe the items which are to be seized renders general searches under them impossible and prevents the seizure, with several specific exceptions,[47] of one thing under a warrant describing another.[48] Looking at the items listed in the search warrant for seizure, we conclude that the warrant did not authorize a search of Anderson's slides.

The warrant authorized a search for marijuana. While the state has suggested that a search of the slides might have revealed traces of marijuana residue, we find this argument untenable. If marijuana were to be detected on the surface of the slide, an "in-hand" examination would have

41. *See* footnote, 7, *supra.*

42. *See* footnote 9, *supra.*

43. 510 P.2d at 798. *See also* Mr. Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587 (1967), citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), in which the expectation of privacy maintained in the home is used as an example of one which is recognized, constitutionally, as "reasonable".

44. Alaska Constitution, Article I, section 22. (See footnote 10, *supra.*) *See also Ravin*

*v. State*, 537 P.2d 494, 503–504 (Alaska (1975).

45. *See*, for example, *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

46. 482 P.2d 854 (Alaska 1971).

47. *See Bell v. State*, 482 P.2d 854 (Alaska 1971).

48. *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *See also Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); and *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

sufficed; displaying the slide to the light to discern the images contained therein was not reasonably likely to reveal the contraband substance.

The warrant also authorized the seizure of "pipes and baggies". Obviously, the holding of the slides to the light can not be sustained as reasonably likely to uncover those items. Finally, the warrant authorized the seizure of "paraphernalia for packaging and use". Again items of this sort were not likely to be revealed by holding the slides to the light. Simply put, the warrant did not authorize the officers to seize photographs, whether they be innocuous or indicative of drug activity. We fail to see how the holding of the slide to the light could have been reasonably likely to reveal items the seizure of which was authorized by the warrant.[49]

Accordingly, we hold that the slides were not in plain view of the officers. We hold, additionally, that Michael Anderson maintained a reasonable expectation of privacy in his slides, and that the warrant authorizing the police officers to search for marijuana, pipes, baggies and paraphernalia for packaging and use of marijuana did not permit the officers to probe and examine items in Anderson's home not reasonably likely to reveal items particularized in the warrant. Because we regard the failure to suppress the evidence unlawfully seized by the officers as erroneous, we are compelled to reverse the conviction and remand this matter to the superior court for proceedings consistent with this opinion. We need not consider appellant's contention that the sentence imposed was clearly erroneous.

REVERSED AND REMANDED.

---

49. *See Bell v. State*, 482 P.2d 854, 860 (Alaska 1971), in which we said:
 [a]n officer may seize evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the searching officer at the time of the seizure

has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the authorized perimeters of the search warrant. (footnotes omitted)