## STATE OF FLORIDA v. GRENCI, et al.

### Case No. 83-2281 CF 10

Seventeenth Judicial Circuit, Broward County

June 12, 1984

### APPEARANCES OF COUNSEL

**James S. Benjamin,** Assistant State Attorney, for plaintiff.

**Bruce L. Randall** for defendant, Grenci.

**Susan Porter,** Assistant Public Defender, for defendant, Morgan.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

### *FACTS FROM AFFIDAVIT FOR SEARCH WARRANT*

On August 8, 1980, in Broward County, Deputy Sheriff Michael Berk purchased the Summer 1980 issue of a magazine entitled "The Disciplinarian's Club" from one William G. Zinn. At the time of the purchase, Deputy Berk also obtained from Mr. Zinn a business card

for a person identified as "Mistress Carla" with telephone number 781-6698. The business card bore no other information but emblazoned thereon is a picture of a woman's shoe (with what is commonly known as a "spike" heel) and a whip (commonly known as a "cat-o-nine tails").

The front cover of the Summer 1980 issue of the above described magazine depicts a scantily clad, buxom female wearing shoes consistent with the shoe depicted on the business card of Mistress Carla. The cover woman of the magazine holds in her hand a braided whip. The anatomy of the cover woman is grossly exaggerated and exposed, encased in only sleeve length gloves and a corset designed to function as both a garter belt and as a resting place for the woman's exposed breasts.

Besides the title of the magazine, the date of publication and the volume number, there is printed on the magazine cover, juxtaposed just above the whip held by the cover woman, the legend "Directory Contacts for the Florida B & D Enthusiast". On page fifteen of the magazine is a full page advertisement for Mistress Carla with three photographs of a person now known to the Court to be defendant Charleyne Grenci. One of the photographs depicts defendant Grenci standing alone, holding what appears to be a spiked paddle, wearing only a corset that serves to emphasize her breasts and to function as a garter belt. On her feet she is wearing shoes with what is commonly referred to as "spike" heels. (It is here noted that the clothing worn by Ms. Grenci is quite similar to the clothing worn by the caricature on the cover of the magazine).

On page fifteen of the magazine there are two photographs of Ms. Grenci, clad as above described, standing astride the body of a female who is on her hands and knees in a crawling position wearing nothing but stockings and a garter belt. The crawling female's buttocks are almost completely exposed, the subject's panties having been lowered to the tops of her thighs. In the latter two photographs, Ms. Grenci appears to be applying a whip and a riding crop to the buttocks and body of the crawling woman. The upper left quadrant of page fifteen of the subject magazine bears the following announcement.

"POMPANO BEACH FLORIDA

P-21011 Professional Dominatrix White Female, 31 Attractive Buxom Booted Bitch, seeks intelligent and Generous Submissives for B/D, S/M Humiliation, Erotic Teasing and/or other mind games. I'm fiery and Stern and demand respect, but I'm understanding and will respect your limits. Novices Welcome. I await your visit in my

well equipped dungeon of delights. WRITE ME IMMEDIATELY. P.H. knows this person and recommends them."

During the month of February, 1982, Deputy Berk obtained a copy of Volume 2, Number 8 of the February 1982 issue of a magazine entitled "Unique Encounters". On page 33 of Unique Encounter magazine is a photograph of Ms. Grenci, clad in a cape and corset in close proximity with another person in restraints and mask; the legend accompanying this photograph reads:

"UEM-325 POMPANO BEACH, FL. Mistress Carla: Definitely "A cut above the rest!" Experience the erotic mysteries of a B&D and S &M session with this sensuous and superior lady. Indulge in you (sic) fetishes and escape to fantasyland. Generousity (sic) mandatory. Call 305-781-6698."

On page 37 of Unique Encounters magazine are two more photographs of Ms. Grenci. In one photograph she is wearing a black dress with a dark cape and is holding a whip. In the second photograph, Ms. Grenci is similarly clad and appears to be touching the penis of an unidentified male wearing restraints with his hands behind his back. The male is completely nude except for the restraints.

The legend accompanying the photographs on page 37 of Unique Encounters reads:

"UEP-427 POMPANO BEACH, FL, Mistress Carla! A true professional Dominatrix! Experience the erotic mysteries of a B&D and S& M session with this beautiful, buxom mistress! Explore your fetishes and fantasies in my dungeon! Generousity (sic) mandatory. Call (305) 781-6698."

On December 29, 1982, Detective D.E. Cable, of the Pompano Beach Police Department, purchased Volume 3, Number 5 of "Unique Encounters" magazine, the issue for December, 1982. Once again Ms. Grenci is reflected in two advertisements. One photograph of Ms. Grenci shows her to be wearing the same general type of clothing as previously described herein, but the whip is significantly different. The second advertisement reflects Ms. Grenci alone in one photograph but in the dark cape and a garment designed to reveal the deep cleavage between her breasts. The second photograph on this same page depicts a male partially clothed in what appears to be women's lingerie and restrained. The male is lying on his back and Ms. Grenci is shown to be kneeling over him, holding onto his chest restraints with one hand and holding a riding crop in her other hand.

The advertising legends on both of the pages of the last described

**65**

issue of Unique Encounters is essentially the same as that contained in the February, 1983 issue of the same magazine. In all of the advertisements the telephone number of Mistress Carla is the same. (It is now noted that the records of the telephone company furnishing service to the residence later identified as that of Ms. Grenci reflect that the telephone number appearing in the above described advertisements and that of Ms. Grenci were identical at all times material to this proceeding.) By calling that number on December 30, 1982, Detective Cable engaged in a conversation with a female who identified herself as "Mistress Carla's assistant". The assistant informed Detective Cable that the business was open on Tuesday through Friday in consideration of the holidays as compared to usual business days' schedule of Tuesday, Wednesday, Friday and Saturday. During this conversation, Detective Cable was informed as to the availability of Mistress Carla in either the afternoon or evening, the existence of the dungeon, the room rental fee of $150.00 and the cost of photographs as well as their availability. No arrangements were made for any future contacts between Detective Cable and Mistress Carla.

A second telephone call to the number advertised for Mistress Carla, made on the same day as the one described above, but this time made by Detective Lightbourne of the Pompano Beach Police Department, resulted in the same basic information being imparted by a female identifying herself as "Mistress Carla's assistant".

At a time that is apparently in close proximity to the time of the above described telephone conversations, Detective Cable observed Ms. Grenci in and about the premises that were ultimately searched pursuant to the search warrant now sought to be quashed and from which the evidence here sought to be suppressed was taken. Additionally, two of the three automobiles seen at the premises searched were ascertained to be registered to Ms. Grenci.

On January 6, 1983, Detective Cable arranged for the garbage deposited on the front curb of the premises searched to be recovered and delivered to him. Examination of the garbage at the Pompano Beach Police Station by Detective Cable disclosed a calendar for the period September, 1981 through December, 1982. Examination of the calendar reveals that commencing with March, 1982 the notations thereon indicate scheduled activities of an unknown nature primarily on Tuesdays, Wednesdays, Fridays and Saturdays. Scattered throughout the aforesaid calendar are references to the magazines previously described herein. In some instances, the calendar bears notations that seem to describe the nature of the activity that is to be indulged in by, or with, a particular individual.

66

Also recovered from Ms. Grenci's garbage were forms consistent with those described by Mistress Carla's "assistant" during the telephone conversations had with Detective Cable and Lightbourne on December 30, 1982. The forms required that the potential customer execute a disclaimer in reference to any law enforcement association. Further, the forms solicited information in reference to the desire for photographs of the "session", to what degree the participant is a "submissive", the nature of activity that was desired and to what level did one's interest rise. The forms made reference to various types of activities clearly concerned with the stimulation of the sexual appetite of one who participated in such activity with Mistress Carla. Included in the itemization of desired information are references to fetishes of various types and varying methodology.

From the esoteric garbage retrieved from Ms. Grenci's residence there was taken a collection of papers containing names, telephone numbers, notes, bills and mail addressed to both Ms. Grenci and Mistress Carla.

At the direction of Detective Berk on January 28, 1983, confidential informant number 696 called the telephone advertised for Mistress Carla and inquired if there was employment available. The female who engaged in the telephone conversation with confidential informant number 696 identified herself as Mistress Carla, made certain inquiries as to the sexual role taken by the confidential informant (that is, dominant or submissive) and described the quality of the room utilized by Mistress Carla during her "sessions". Mistress Carla took the telephone number of the confidential informant and assured him that she would call him in the event a job opportunity should arise in the future.

A second telephone call to the number of Mistress Carla was made on January 28, 1983, this time by confidential informant number 704. At Detective Berk's direction, informant number 704 made a date for a "session" with Mistress Carla. The unidentified female who engaged in the dialogue with the confidential informant advised him that a session with two females would last one and one half hours for a fee of $200.00. Arrangements were made for the confidential informant to call back on January 31, 1983, for the purpose of confirming the appointment of February 1, 1983, and to receive directions for the session.

On February 1, 1983, confidential informant number 704, pursuant to a telephone call initiated by him to the number advertised for Mistress Carla, received directions to proceed to a specific gasoline

67

station at the intersection of Copans Road and Dixie Highway in Pompano Beach. Upon arrival at the gasoline station the confidential informant was to again call the number for Mistress Carla from a pay telephone at 6:00 p.m.

Prior to departing for his rendezvous, the confidential informant was given $280.00 in United States currency in bills of various denominations, the serial numbers of which had been recorded. Upon receiving the currency, the confidential informant proceeded to the intersection of Copans Road and Dixie Highway (under the watchful eyes of appropriate surveillance units) where he made the necessary telephone call to Mistress Carla's residence. Within ten minutes after making the aforesaid telephone call, Defendant Morgan arrived at the gasoline station and led the confidential informant to the residence which was ultimately searched pursuant to the search warrant now challenged.

Upon arrival at the residence, the confidential informant received instructions to fill out forms similar to those recovered from the garbage of Ms. Grenci and he delivered to Defendant Morgan the sum of $200.00 utilizing the investigative funds furnished by Detective Berk. Responding to the solicitation to do so, the confidential informant delivered to Morgan the sum of $50.00 for the purchase of several photographs of Ms. Grenci a/k/a Mistress Carla in session with others as well as with the confidential informant. Confidential informant number 704 was then escorted into the "dungeon" where he was soon greeted by Ms. Grenci in her role of Mistress Carla.

During the course of his presence in the "dungeon" in the company of Mistress Carla, the confidential informant engaged in a variety of activities apparently designed to fulfill his alleged sexual fantasies. Accompanied by the appropriate dialogue, confidential informant number 704 was directed to disrobe and to kiss the feet of Mistress Carla after which a leather dog collar was placed around his neck and he was then restrained upon a bed. Once the confidential informant was restrained, Mistress Carla applied a cream to his rectum and inserted her thumb which was soon removed and replaced by the insertion of a dildo. Upon the completion of this activity, the informant was released from his restraints and ordered to lick Mistress Carla's legs while defendant Morgan took pictures. Photographs were also taken of the informant when he was strapped to a wall of the dungeon, his face encased in a mask, a chain around his penis and a fake penis inserted in his mouth.

When released from the wall restraint, the informant was again strapped to the bed where he was whipped upon the buttocks by

68

Mistress Carla. Once again released from the bed restraints, other restraints were placed about the body of the informant and he was ordered to follow Mistress Carla into a bedroom. In the bedroom Mistress Carla required the informant to perform cunnilingus upon her, upon the conclusion of which the informant was led into another room where he was again placed in restraints attached to a wall and hoisted to a height which prevented his feet from touching the ground. It was while the informant was in this last described position that Mistress Carla a/k/a Defendant Grenci manipulated his penis and inquired as to his explanation for his apparent inability to achieve an erection.

More photographs were taken of the informant with a mask over his face, a fake penis in his mouth and his body hoisted above the floor. Once again the photographs were taken by Defendant Morgan. The conclusion of the photographing led into the next activity of Mistress Carla with the confidential informant wherein he was released from the wall hoist, placed upon a bed, cream was applied to his penis and testicls, clips were attached to his nipples and Mistress Carla performed masturbation upon him.

Upon the conclusion of all of the above described activity with Ms. Grenci and Ms. Morgan, the confidential informant was released from his restraints and permitted to put on his clothing. Once dressed, Ms. Morgan presented the confidential informant with several photographs depicting bondage and/or sadomasochistic activities occurring inside the premises which the informant recognized as the interior of the house herein searched. In the photographs, Ms. Grenci is depicted, scantily clad, to be engaging in various acts of sexual dominance with a male in restraints. Ms. Morgan also gave the informant, upon his departure from the premises, a business card of Mistress Carla and advertisements for the purchase of products classified as "Collectors Items" and "The International Slave Training Course".

### HISTORY OF THE CASE

The information concerning the activities inside the premises searched was furnished by the confidential informant to Detective Cable and Deputy Berk at the Pompano Beach Police Department on February 1, 1983 upon their completion of surveillance of the premises searched, which surveillance included the entire span of time that the informant was within the premises participating in the activities above described.

Detective Cable and Deputy Berk, on Feburary 4, 1983, made application to Hon. Thomas M. Coker, Jr. for the issuance of a search

warrant of the premises where the activities above described occurred, reciting in their affidavit the information contained herein. Judge Coker issued the requested search warrant on the date of application. The search warrant was executed at or about 5:15 p.m. on the date of issuance and the inventory of the items seized was prepared on that same date.

On March 7, 1983, Defendants Morgan and Grenci were arrested. By Information filed on March 3, 1983, and as amended on September 20, 1983, both defendants were accused of keeping a house of ill fame, living off the earnings of a prostitute and receiving a person in a place for the purpose of assignation or prostitution. Defendant Morgan was, in addition to the foregoing, charged with the crime of forcing another to become a prostitute. Pursuant to notice, the defendants were arraigned and discovery proceedings were commenced. In due course of time, Motions to Suppress were filed in behalf of both defendants and hearings thereon were conducted on several different days, spanning a period of time from September 19, 1983 to April 12, 1984. Both the State of Florida and counsel for each of the defendants have filed extensive memorandums of law, the Court has heard relevant testimony, and arguments of law and fact have been received by the Court.

## ANALYSIS OF APPLICABLE LAW

### STANDING TO CHALLENGE SEARCH AND SEIZURE

The house which was the subject of the search herein was titled in the name of Ms. Grenci but she and Ms. Morgan both made it their residence. The Court is satisfied, therefor, that each of the defendants are possessed of the requisite right in law to challenge the validity of the search of the premises and the seizure of the various items of personal property. *United States v. Salvucci*, 100 S.Ct. 2547 (1980); *Rawlings v. Kentucky*, 100 S.Ct. 2556 (1980); *Inchastigui v. State*, 392 So.2d 319 (Fla. 4th DCA 1980) cert. den. 402 So.2d 610 (Fla. 1981); *Kilpatrick v. State*, 403 So.2d 1104 (Fla. 1st DCA 1981); *Brady v. State*, 394 So.2d 1073 (Fla. 4th DCA 1981).

### ADEQUACY OF DESCRIPTION OF THE PREMISES TO BE SEARCHED

The seminal test that is to be applied to each and every search warrant when determining its adequacy is simply whether the description contained in the search warrant is sufficient to lead the executing officers to the target premises to the exclusion of all others. *State v. Brooker*, 449 So.2d 386 (Fla. 1st DCA 1984); *Shead v. State*, 358 So.2d 1117 (Fla. 1st DCA 1978). The application of such test is to be made

from a perspective of common sense rather than from the perspective of the trained analytical eye of an attorney. *United States v. Strauss*, 678 F.3d 886 (C.A. 11, 1982).

In the case now before the Court, the Affidavit and Search Warrant both contained detailed descriptions of the exterior for the premises searched, the street address thereof (including the city and county) and both had exterior photographs attached. The description of the building to be searched is more than legally adequate.

The house that was searched in the matter before the Court has eight rooms and an attached garage. It is apparently the garage that has been converted into what has been referred to as a "dungeon". Defendants assert that the search warrant is defective because it permitted the search of the entire structure rather than just the rooms referred to by confidential informant 704. Defendants rely upon *Fance v. State*, 207 So.2d 331 (Fla. 3rd DCA 1968) and *State v. Gordillo*, 245 So.2d 898 (Fla. 3rd DCA 1971). For the reasons outlined below, the Court is of the opinion that such reliance by defendants is misplaced.

In *Fance,* supra, an informer told police that gambling was being conducted in a room in back of the poolroom in a building wherein the first floor was occupied by said poolroom, which had a room in back and a shoeshine parlor. The upstairs portion of this building was utilized as living quarters by seven persons. The warrant as issued gave permission to search the entire building although when executed, the upstairs portion was not searched. Because the police had information upon which they could have drawn in order to obtain a search warrant limiting their search to a specified area of the target premises, the evidence was suppressed. To quote the opinion of Judge Pearson, at page 333:

". . . The description in this warrant was so indefinite that under the authority of the warrant an officer could have exercised selective discretion in determining where he could search and thereby would have invaded the property of strangers to the process. The warrant commanded the police to conduct a blanket search of an entire building when probable cause was shown only for a portion of that building. The State has not shown that it had a reasonable basis for assuming that the building was a single occupancy building . . ."

In the case before the Court, there is no question but that the premises were nothing but a single family occupancy building; there was no likelihood that the property of persons unconnected with the process would be involved. The garage was physically attached to the living quarters without any obvious lines of demarcation shown to the

**71**

Court. Further, as related by confidential informer 704, he was directed to enter the premises through the front door; he filled out forms while seated upon a couch located in close proximity to the point of entrance, the experiences with defendant Grenci occurred in the garage/dungeon and at least two rooms described as having beds in them. Furthermore, the items utilized during the "session" were all patently moveable and capable of being concealed anywhere within the residence of Ms. Grenci.

The inapplicability of *Gordillo,* supra, is quickly demonstrated when the opinion itself is read. There were two separate and distinct living units, unconnected, occupied by two different persons. The State had ample opportunity to determine that there were two different living units within the building to be searched. Thus it becomes apparent that the real rule to be lifted from *Gordillo,* supra, is that sloppy police work will not be tolerated by the courts of this State.

This Court concludes, therefore, that the grant of permission to search the entire interior of the residence of Ms. Grenci and Ms. Morgan was not only good common sense, it was legally sound.

## ADEQUACY OF PROBABLE CAUSE

Defendants assert that there was a legal lack of probable cause for the magistrate to believe that a crime was committed and that evidence of that crime was at the premises sought to be searched. The focal point of this attack is the reliance by the police upon the statements of the confidential informant (apparently confidential information 704) and the failure of the police to demonstrate the "reliability" of said confidential informant.

Florida Statute 933.04, Article I, Section 12 of the Florida Constitution and the Fourth Amendment of the United States Constitution all share one thing in common: they stand for the proposition that all people in this country and state are to be secure from unreasonable searches and seizures and that no search warrant shall issue except upon probable cause as recognized in law. The determination of the presence or absence of probable cause has presented the courts of this state, and of the United States, with a myriad of factual situations, and has resulted in huge volumes of opinions, reports, digests and analyses. In the end, the ultimate question to be answered in the pursuit of that elusive concept called probable cause is whether the information imparted through the affidavit would lead a reasonably prudent and cautious person to believe that an offense had been committed, and is the evidence thereof likely to be found within the premises sought to be searched. If the answer to both parts of the question is in the

72

affirmative, the search warrant should issue; if the answer to either or both parts of the inquiry is in the negative, then the search warrant should not issue. See *Line v. State*, 395 So.2d 1268 (Fla. 4th DCA 1981).

The recent case of *Illinois v. Gates*, 100 S.Ct. 2317 (1983) served to relax the rather rigid rules of *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969). The issuing magistrate is now required to apply a common sense test, taking into consideration all relevant factors. The issuing magistrate first makes a common sense decision of whether, given all the facts and circumstances set forth in the affidavit before him, there is a fair probability that evidence of a crime will be found in the premises sought to be searched. Once such decision is made, the sole function of a reviewing court (as is this Court in the present instance) is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed when the warrant was issued. *Ilinois v. Gates*, supra.

The cases relied upon by Defendants in support of the proposition here addressed are no longer controlling in view of *Illinois v. Gates*, supra. It is to be noted, however, that where the officer making the affidavit in support of the request for the search warrant has sworn to the reliability of the confidential informant, such affirmation has been accepted as sufficient indicia of reliability. *State v. Gieseke*, 328 So.2d 16 (Fla. 1976) as cited in *State v. Cohen*, 442 So.2d 346 (Fla 1st DCA 1983).

Further, this is not a case in which the information from the informant is the sole or primary basis upon which the magistrate issued the search warrant. It is clear that a continued pattern of conduct is demonstrated, at least to the extent required for probable cause, that Ms. Grenci was operating a business from her residence and that the nature of the business addressed itself to the satisfaction of the sexual peculiarities of whomever solicited her services. To support this supposition, without relying upon the information furnished by the confidential informants, the magistrate had before him the (1) advertisements that appeared in the 1980 issue of the magazine entitled "The Disciplinarian's Club", and in the 1982 issue of a magazine entitled "Unique Encounters", (2) the business card obtained in 1980, and the telephone records confirming that the advertised number for those seeking to reach Mistress Carla was, in fact, the telephone number of Defendant Grenci, (3) the telephone conversations between Detective Cable and Detective Lightbourne, and a female who identified herself as "Mistress Carla's assistant" on December 30, 1983, (4) the contents of the

garbage recovered from the swale of the road by the residence of Ms. Grenci, and (5) the observations of Ms. Grenci in the house searched and the vehicles parked in the driveway and the confirmation that she was one and the same as the woman whose picture in the aforementioned magazines was identified as "Mistress Carla". To assert that the confidential informants did anything other than corroborate that which was already fairly well established, i.e., the utilization of the premises for commercial activity that is sexually oriented, is to close one's eyes. Even a horse with blinders attached to its head is capable of seeing that which is obvious. Certainly, it is not the suggestion of the learned trial attorneys for the accused parties herein that the issuing magistrate and this Court are not possessed of fundamental analytical and reasoning powers sufficient to conclude that there is good reason to suspect that whomever resided in the premises here searched was, at the least, utilizing the premises for the purposes of arranging clandestine meetings for sexual activity? The question suggests its own answer.

Over thirty years ago, the Florida Supreme Court, in *Dunavant v. State*, 46 So.2d 871 (Fla. 1950), addressed the issue of defining the elusive term "probable cause" and came to a conclusion based upon that court's understanding of the pronouncement made by the United States Supreme Court in *Dumbra v. United States*, 45 S.Ct. 546 (1925). In *Dunavant*, supra, Justice Chapman wrote, at page 874:

> "The term 'probable cause' has been defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged. The courts in determination of probable cause are not concerned with the question of the guilt or innocence of the accused but whether or not the affiant has reasonable grounds for his belief. If the facts set out in an affidavit for 'a search warrant are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, then there is probable cause for the issuance of the search warrant. . ."

The language contained in *Dunavant*, supra, was quoted with approval in *Swartz v. State*, 316 So.2d 618 (Fla. 1st DCA 1975) and in *Younger v. State*, 433 So.2d 636 (Fla. 5th DCA 1983). Probable cause, according to the Fifth District Court of Appeal in *Younger*, supra, is to be interpreted to mean reasonable ground to suspect that the items sought to be discovered are, in fact, within the premises sought to be searched. Even a casual reading of the affidavit submitted to the issuing magistrate in this cause reflects the soundness of judgment and com-

74

mon sense exercised in the issuance of the search warrant now sought to be quashed and the evidence seized thereunder suppressed.

## VAGUENESS AND OVERBREADTH OF THE SEARCH WARRANT

The issue now under discussion (that is, whether the search warrant as issued afforded free or unfettered discretion to the executing officers insofar as just what property should be seized) is the issue that is most troubling the Court.

It is well settled that both organic and statutory law require that the search warrant not grant free license to the executing officers as to what may be taken from the possession of the person to whom the premises searched belongs. Put another way, nothing is to be left to the discretion of the executing officer. As said in *Purcell v. State*, 325 So.2d 83, 85 (Fla. 1st DCA 1976):

"The Fourth Amendment to the Constitution, made applicable to the States by the Fourteenth, proscribes unreasonable searches and seizures and forbids that warrants issue without 'particularly describing the place to be searched, and . . . things to be seized.' 'General searches', reminiscent of those conducted under the despised writs of assistance in pre-Revolutionary days, 'have long been deemed to violate fundamental rights. It is plain that the amendment forbids them.' *Marron v. United States*, 275 U.S. 192 . . . (1927)."

Both *Purcell* and *Marron*, supra, stand for the additional proposition that the things sought to be seized must be specifically described in order to prevent the seizure of one item when the seizure of another is all that has been authorized. While conducting an authorized search, the executing officers may seize evidence of criminal activity which is in "plain sight", *Harris v. United States*, 331 U.S. 145 (1947); *Ensor v. State*, 403 So.2d 349 (Fla. 1981); *State v. Rickard*, 420 So.2d 303 (Fla. 1982). The executing officers cannot, however, do that which is not authorized by the search warrant. Where the warrant authorizes the seizure of a described film, it is not permissible for the officers to seize and project film that is not specified in the warrant where in order to ascertain the contents of the films it was necessary to remove the films from their boxes and screen them. *Schergen v. State*, 371 So.2d 575 (Fla. 2d DCA 1979).

As contemplated by *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the "plain view doctrine" is defined as a situation wherein the seizing officer is in a constitutionally protected area and observes contraband in the protected area. The critical issue of the "plain view

doctrine" is that the officer in question is already legally within the protected area and the contraband is inadvertently found. *Ensor v. State*, supra. It is obvious from the information before the Court that the evidence obtained when the executing officers in the instant case seized certain cameras and undeveloped film and caused such film to be developed is not that type of evidence authorized to be seized by the issuing magistrate.

It is important to note, while discussing the particular issue now being reviewed, that explicit description of the thing to be seized is not without limitation in law. Recognizing that a warrant that is deficient in its description of the thing to be seized is constitutionally overbroad, what constitutes a sufficient description is dependent upon the circumstances of the individual case. When the items to be seized are books, papers, film, recordings and similar items protected by the First Amendment, only scrupulous exactitude in their description in the search warrant will be acceptable. *Stanford v. Texas*, 379 U.S. 476 (1965). When the items sought are not so protected by the First Amendment, it is necessary to look at the nature of the thing to be seized and the particular circumstances of the case. *State v. McCrery*, 402 So.2d 409 (Fla. 1st DCA 1981). The requirement that a search warrant specifically describe both the property to be searched and the property to be seized is to be given a reasonable interpretation consistent with the type or character of the property sought, and a distinction is to be made as to whether the property is inherently innocuous or inherently illegal. *Carlton v. State*, 418 So.2d 449 (Fla. 5th DCA 1982) aff. 9 FLW 80 (Fla. 3/8/84).

Utilizing the foregoing law and the common sense test referred to in *Illinois v. Gates*, 100 S.Ct. 2317 (1983), this Court has reached mixed conclusions as to those items seized pursuant to the search warrant now under review. The only two lines that are troublesome in nature are found in the "seizure clause" of the search warrant, specifically the command to seize "any and all applications or resumes for . . . other unspecified positions of employment . . ." The Court fails to see how the applications for employment at legitimate occupations could be properly the subject of a seizure given the contents of the Affidavit submitted in this cause. Further, the search warrant does not grant express or implied permission to the executing officers to seize any camera equipment or undeveloped film. Consequently, as to any such items the Court finds that the executing officers exceeded their authority. The Court is satisfied that the remaining items described in the "seizure clause" of the search warrant are described with that degree of particularity required by law.

76

In view of the conclusion reached by the Court in reference to the assertion that the search warrant was vague and overbroad, the Court does not find it necessary to address any issues related to whether or not the affidavit was physically attached to the warrant.

## FIRST AMENDMENT VERSUS FOURTH AMENDMENT

The Court has carefully considered the allegations made by the Defendants that certain items seized were taken in violation of protections afforded by the First Amendment of the United States Constitution, thereby creating an apparent conflict between that amendment and the Fourth Amendment of the same document. Because the issues involved in this case do not relate to obscenity or pornography and because it is not the possession of the complained of items that constitutes the focus of this inquiry (as compared to the use for which the complained of items are, or were, utilized), this Court is of the opinion that First Amendment issues need not here be resolved.

## CONCLUSION

The Motion to Suppress, as originally filed and as amended, is denied in part and granted in part.

As to the items identified below, the Motion to Suppress is GRANTED:

1. Four cameras and their contents.

2. Seventeen audio tapes.

3. All applications for employment.

As to all other items listed upon the Inventory List, submitted by the State pursuant to order of this Court, and the items listed by the Defendant Grenci in her Memorandum of Law dated February 17, 1984, the Motion to Suppress is DENIED.