[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS
In the above-captioned matter, the defendant seeks to suppress (1) all statements, tests, photographs and observations made by and of the defendant; (2) warrantless seizures, photographs and observations of items from defendant's automobile; (3) warrantless seizures of items from defendant's home; and (4) seizures, photographs and observations made pursuant to warrants of defendant's person and home.
The basis of the defendant's motion to suppress is that there was no probable cause to make the seizures; that the statements and tests made were the result of defendant's illegal detention or arrest; that they were obtained in violation of defendant's Miranda rights; that they were not voluntarily and knowingly and intelligently made and that some of the items seized were not listed on the warrants (See Defendant's Amended Motion to Suppress).
The following testimony, inter alia, was elicited at the suppression hearing.
On May 5, 1988, State Police Officer John Kananowicz (Kananowicz), pursuant to a call he received about 2 a.m., went to 2443 Route 32, Montville, the Rasmussen residence. He arrived there about 0210 hours and met Trooper Brady. They CT Page 3376 went to the front door, where he observed the defendant, who was dressed in a bathrobe, screaming and yelling, "Come in, come in, my wife's dead, upstairs, upstairs in the bedroom." Kananowicz had the defendant secure the dogs he had with him, as they appeared to be vicious and were barking aggressively. He then followed the defendant upstairs to the bedroom where he observed the body of the defendant's wife.
About 2:23 a.m. to 2:33 a.m., May 5, 1988, Kananowicz, who felt that the entire scenario and the telephone call were very suspicious in nature and that the defendant was a suspect, read the Miranda warnings to the defendant from a Miranda rights card. (See State's Exhibit C.) At this time, the defendant was not crying or hyperventilating.
The defendant did not sign any form concerning the advisement of his rights as Kananowicz did not have such form available.
Officer Lynch from the Montville constabulary force was present when the Miranda rights were given to the defendant. Further, at that time, if the defendant wanted to leave, Kananowicz would have prevented him from doing so.
Sometime after 2:30 a.m., and after he had been given his Miranda warnings, the defendant was hyperventilating. He would inhale and exhale, holding his breath at times and would crunch up like a ball on the floor and rock back and forth, breathing deeply and exhaling.
About 3 a.m., on May 5, 1988, Detective Michael F. Foley (Foley) of the Connecticut State Police Major Crime Squad arrived at the Rasmussen residence. Kananowicz told Foley that he had given the defendant the Miranda warnings and told him what he had observed at the scene. He did not tell Foley that he felt the defendant was a suspect. Foley was informed by Sergeant Sullivan of the Montville Police Department that the scene had been secured; that about 2:45 a.m., he met the defendant who was lying on the floor in the foyer and that the defendant told the police that he had found his wife dead in the upstairs bedroom.
At about 3:15 a.m., Foley identified himself to the defendant, told him to get dressed; that he would take care of him and that they would go to the Connecticut State Police Troop E Barracks where the defendant would be more comfortable. Foley wanted to remove the defendant from the crime scene. CT Page 3377
Foley and the defendant went to the master bedroom where the defendant put on underwear, blue jeans, slipper-type shoes and a bathrobe. They then went to Foley's cruiser where the defendant got into the passenger seat. Prior to the defendant getting into the cruiser, no conversation took place between Foley and the defendant, except that Foley told the defendant where they were going and that they were leaving the house. The defendant went with Foley voluntarily.
When Foley first saw the defendant, he was emotionally distraught, crying and hyperventilating. He was crying when asked to go to Troop E and cried while in the conference room at Troop E.
After a few minutes in the cruiser, the defendant regained his composure. Foley asked the defendant about what happened that evening since he was the only witness that the police had at that time.
The defendant replied that he was asleep in his bedroom; that he was awakened by a clunking sound; that he noticed the bathroom light on; that his wife was not in the bedroom; that he waited awhile, and not hearing anything, called her name; when she didn't respond, he got up to investigate; that he looked in the bathroom; that the dog Barney was barking; that this drew his attention to the bedroom door at the opposite end of the hall; that he went there and had to force that door open, saw his wife on the floor and believed she was dead.
Foley and the defendant arrived at Troop E about 3:30 a.m. and went into the conference room. The conference room is a quiet, clean and comfortable large room with windows at one end, cushioned chairs, a conference table, and a double set of swinging and push doors without any latches or handles.
The defendant was told that this was a homicide investigation which was very time consuming and that the police would spend a lot of time at the house processing the scene for evidence. They discussed a search of the defendant's property and the property that would be searched. Defendant mentioned the dog grooming business adjacent to the house and a shed or outbuilding in the back of the property.
Foley presented the defendant with a consent to search form which the Defendant read and seemed to understand. The defendant signed the form about 3:45 a.m. which permitted a search of the property at 2443 Route 32, Norwich New London Turnpike, Uncasville (State's Exhibit A). The defendant was not advised that he had the right to refuse to sign the form. CT Page 3378
Between 3:30 a.m. and 4 a.m., although the defendant was initially crying and very upset, he answered any question Foley asked him. Foley and the defendant went over the details again. The defendant told Foley the same things he told him in the cruiser concerning the events of the day and evening before going to bed and what he did immediately after finding his wife dead. The defendant did not volunteer anything else.
About 3:45 a.m., Foley, who had noticed scratch marks on the defendant's inside left forearm area and on the backside of the defendant's right wrist and what appeared to be smears of blood on the defendant's hands and elbow, asked the defendant about the scratch marks and the blood smears. The defendant stated that the scratches came from holding onto the dog and the blood from leaning over his wife when he first saw her.
Detective Bissonette (Bissonette), who had been to defendant's residence for about 25 minutes, arrived at Troop E about 4 a.m. on May 5, 1988.
At Troop E, Foley told Bissonette that the defendant stated that he and his wife had retired at 9:30 p.m.; that they were involved in sex until about 10:15 p.m.; that the defendant went to sleep and was awakened by a single clunk noise; that he felt it came from within the house but outside the bedroom; that his wife was not in bed; that he saw the bathroom light on; that the dog, Bonnie, lying at the foot of the bed was not barking, nor was the second dog barking; that the defendant then went into the bathroom and laundry room and did not see his wife; that he called for her but did not receive an answer; that a dog was growling, making noise towards the bedroom upstairs in the northeast corner of the house; that upon arriving there the defendant forced the door open and found his wife on the floor; that he may have kneeled by her side and determined that she was dead; that he returned to the bedroom and set off the panic alarm system which activated the exterior lights; that he returned to his wife, may have grabbed her at the waist, may have put his head in her chest, but that he did not move her; that he then called the State Police and reported that his wife was dead and gave his name and location; that it took him fifteen to twenty seconds to get up and thirty seconds to find his wife and activate the alarm. Foley also told Bissonette that there appeared to be blood on the defendant's right hand, right palm, right elbow and a fresh appearing scratch on the inside of defendant's left forearm.
At Troop E shortly after 4:30 a.m., the defendant CT Page 3379 acted out what he did when he woke up. He became agitated at this time at continued questioning about the blood and scratches and asked that the detectives stop asking about the blood and scratches.
After speaking with Foley, Bissonette returned to the crime scene, related the information he had received from Foley to Sergeant O'Connor, obtained a 35 millimeter camera and returned to the conference room at Troop E at about 4:51 a.m. when he was introduced to the defendant.
About 5 a.m., Foley and Bissonette discussed with the defendant the possible need to examine defendant's person. Initially, they examined the most obvious scratch marks; the one on the inside of the defendant's left forearm and some red marks on the backside of his right wrist. Bissonette asked the defendant if he could photograph the blood on his hands and arm and the scratch marks. Defendant agreed. Photographs were taken.
The defendant was asked to remove his robe so that the upper part of defendant's body could be checked for any other scratch marks or blood. This was done as the detectives wished to check defendant further as he might possibly be the one who murdered his wife. Defendant agreed and removed his robe.
When defendant removed his robe, additional scratch marks were seen on defendant's upper left shoulder and on the back of his neck just below the collarline and some redness around defendant's upper chest and neck area. When asked about how he got such marks on his body, the defendant mentioned that he was in a dog grooming business and that a dog had jumped on his shoulder around noontime of the previous day.
Photographs of the defendant were taken and completed shortly after 5 a.m. The defendant did not object to the search of and photographs of his person and cooperated with Foley and Bissonette.
Shortly after 5:10 a.m., when being questioned about the scratches, the defendant asked the detectives to stop asking about the scratches or he would like to see an attorney. No further questions were asked at that time. However, the defendant did not call an attorney at that time.
At about 5:15 a.m., the defendant became a suspect in Foley's opinion. Foley told the defendant that his story was not believable; that someone breaking in without defendant hearing it; his wife getting up without waking him; the fact CT Page 3380 that the dogs were not barking; that if the defendant got up within fifteen seconds of hearing a clunk, he would have heard someone leaving; that the slash marks on the victim indicated that there was a struggle; that the wife probably would have been screaming and that the scratch marks on the defendant were fresh. Bissonette also believed that the defendant probably murdered his wife. Foley then asked defendant if he killed his wife. Defendant responded that he had not.
At 5:20 a.m., Foley advised the defendant that he was not in custody.
About 5:24 a.m., Bissonette advised defendant of his Miranda rights and then questioned him about his involvement in his wife's murder. This stopped when defendant told Bissonette he wanted a lawyer, however, defendant did not call an attorney.
At 5:29 a.m., when defendant told Bissonette that he did not want to talk about his involvement in the killing of his wife, he did agree to talk about other things or answer other questions. Defendant was advised he did not have to answer any questions and could call his attorney and have him present. Defendant called for an attorney but could not reach him. Defendant did not want to continue the interview. It terminated.
About 5:30 a.m., at defendant's request, Foley called defendant's parents.
According to Foley, the defendant was not free to leave at that time. However, if defendant insisted on leaving, he could leave but Foley would try to stay with him, as he considered the defendant a witness. However, the defendant never asked to leave.
Between 5:45 a.m. and 6 a.m., Foley, with the defendant's consent, took fingernail scrapings and samples of blood smears seen on defendant's person. Shortly after 6 a.m., defendant's parents arrived and went into the conference room with the defendant.
Between 6 a.m. and 6:30 a.m., Foley was informed that a search warrant of the defendant was being issued. About 7:45 a.m., Foley was advised that the warrant had been signed and advised the defendant.
Thereafter, the detectives left the conference room with the defendant and went into the processing room where the defendant disrobed and was searched more thoroughly. At 10:21 CT Page 3381 a.m. on May 5, 1989, in executing the search warrant, Bissonette took swabs of the smears on defendant's elbows and scrapings of his fingernails.
Pursuant to the consent form (State's Exhibit A), the defendant's premises were searched later that morning. The house, business and shed were searched pursuant to the consent form.
The search warrant of the defendant's person when received was executed by Bissonette assisted by Foley. Pursuant to the warrant they took the defendant to the Backus Hospital where blood was taken from the defendant. When they were finished at the hospital, the detectives and the defendant returned to Troop E where Doctors Lee, Shaw and Katznelson, who had arrived around 1 p.m., examined the defendant in the processing room. The complete search ended around 2:30 p.m. The defendant then left Troop E.
Bissonette observed Dr. Katsnelson of the Chief Medical Examiner's Office examine the scratches on the defendant and take skin tags from the defendant's forearm. Bissonette saw Dr. Lee examine the defendant for the presence of blood splatter.
Photographs of defendant's person were taken on Dr. Lee's direction while he was examining the defendant.
Subsequently, defendant volunteered to answer questions. At 2:16 p.m, Bissonette advised defendant of his constitutional rights. Defendant initialed several items on the waiver of these rights form (Defendant's Exhibit 1) and the interview began.
Bissonette had the defendant read a sentence from the bottom portion of the rights card to make sure the defendant could read and understand and had him initial after each sentence on the waiver form. When defendant got to that portion of the waiver form about making a statement without an attorney present, the defendant stated that he did not want a lawyer present. Defendant was offered the opportunity to call an attorney but refused.
 I.
A. As to the search of the 1987 Nissan Sentra automobile, Defendant's Exhibit 24, a stipulation of facts approved by Assistant State's Attorney Kevin Kane and defendant's counsel, Hubert J. Santos, satisfies this Court, inter alia, that, although the victim, Loreli Rasmussen, was CT Page 3382 the registered owner of the automobile, the defendant was involved in the purchase of said automobile, signed some of the documents involved in the purchase of the automobile and was the principal operator of the automobile.
Based on the above and the contents of Defendant's Exhibit 24, this Court finds that the defendant had a subjective expectation of privacy in said automobile which was reasonable. State v. Pittman, 209 Conn. 596, 601 (1989). Accordingly, the defendant has standing to challenge the constitutionality of the search of said automobile.
B. The State claims that the automobile was legally searched pursuant to a search and seizure warrant signed by Quinn, J. (State's Exhibit B) and/or pursuant to the consent to search form signed by the defendant (State's Exhibit A). The State does not claim the right to search the automobile under any of the recognized exceptions to a warrantless search.
The consent form (State's Exhibit A) provides for a search of the defendant's residence, place of business and storage shed located at 2443 Route 32, Montville. Nowhere in the form is the description of the automobile stated. In addition, the State claims that the search and seizure warrant signed by Quinn, J., being of 2443 Route 32, Montville, the defendant's premises, permitted a search of the entire premises of the defendant which included the automobile parked in the driveway of said premises. The defendant disagrees.
The consent form (State's Exhibit A) contained printed language indicating areas for search such as residence, place of business, garage. It also included a blank space within which could be included other areas or items of search. If the automobile was to be included in the consent form signed by the defendant, it should have been specifically listed and described therein. See Stanford v. Texas, 379 U.S. 476,481 (1965), Connecticut Constitution, Article I, Section 7.
The search warrant (State's Exhibit B) does not contain a specific description of the automobile as an item to be searched although it refers to a search of 2443 Route 32, Norwich New London Turnpike, Uncasville, Connecticut. The search warrant is primarily directed to a search of the residence of Erik and Loreli Rasmussen.
If the automobile was to be searched, it should have been specifically identified in the search warrant. State's Exhibit B did not specifically identify the automobile as an CT Page 3383 item to be searched and thus it did not authorize a search of the automobile. For reasons stated, defendant's motion to suppress as to the search of the automobile and items seized therefrom is granted.
 II.
The Court finds that the defendant called the police to report his wife's death; that he voluntarily answered all the questions and submitted to a search of his person; that he voluntarily consented to a search of his residence, place of business and storage shed; that he was advised of his Miranda rights on May 5, 1989 at about 2:30 a.m. before any questioning of the defendant or search of his person or his premises; that defendant became a suspect in Detective Bissonette's opinion shortly after 4 a.m. and was not free to leave Troop E; that during questioning the defendant advised the police that if they continued to ask him questions about the scratches on his person he would want an attorney; that the defendant became a suspect to Detective Foley, who did much of the questioning of the defendant and search of his person, at about 5:15 a.m.; that defendant was again advised of his Miranda rights by Detective Bissonette about 5:24 a.m. who stopped questioning the defendant when defendant stated he wanted a lawyer; that defendant's parents were called about 5:30 a.m. at defendant's request; that defendant never asked or tried to leave Troop E; that about 7:45 a.m. the defendant was advised that a search warrant of the defendant had been signed; that the defendant was not in custody or deprived of his freedom of action in any significant way during his interrogation by Detectives Foley and Bissonette, and that according to Foley, defendant was free to leave but that Foley would try to stay with him as he was a witness.
Although the evidence differed as to whether the defendant was free to leave, the Court finds that the defendant never asked or tried to leave; that no one told him he could not leave; that the totality of the circumstances did not indicate to him any reasonable belief that he was in custody and that he was not free to leave.
The advisement to the defendant of his Miranda rights made the defendant aware of his constitutional right to remain silent. In fact, the defendant exercised his rights by stating that he would want a lawyer if the police continued to question him about how he got the scratches on his body.
Although the defendant was advised of his Miranda rights three different times, he never indicated he did not understand them. In fact, when Bissonette showed the defendant CT Page 3384 the advisement of rights form, he initialled his understanding of them except to the paragraph waiving his rights to an attorney.
The Court finds that the defendant understood his rights and made a knowing, intelligent and voluntary decision to answer questions asked of him and to permit an examination, search and photographs of his person.
The Court finds that the search warrant (Defendant's Exhibit 2) does contain sufficient probable cause to warrant its execution. It authorized a search of the defendant's person which contained signs that could have involved him in his wife's death.
There was no evidence that if, in fact, the inventory of items seized was not complete, the defendant was prejudiced by any omission.
For reasons stated, the remaining grounds of the motion to suppress before this Court are denied.
VASINGTON, J.