**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

RICKY D. WEBSTER,

     Defendant - Appellee.

Nos. 15-3027
15-3028

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:10-CR-20101-CM-2)**

---

Richard A. Friedman, Attorney, Appellate Section, Criminal Division, United States Department of Justice, Washington, DC (Leslie R. Caldwell, Assistant Attorney General, and Sung-Hee Suh, Deputy Assistant Attorney General, United States Department of Justice, Washington, DC; and Barry R. Grissom, United States Attorney, and Terra D. Morehead, Assistant United States Attorney, Office of the United States Attorney, District of Kansas, Kansas City, Kansas, with him on the briefs), for Plaintiff-Appellant.

Ryan C. Hudson (Jeffrey D. Morris, with him on the brief) of Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, Kansas City, Missouri, for Defendant-Appellee.

---

Before **KELLY**, **SEYMOUR**, and **MATHESON**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Ricky D. Webster pled guilty to conspiracy to manufacture and possess with intent to distribute 50 grams or more of cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841, 846, and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). We denied his direct appeal as untimely. The district court subsequently granted Mr. Webster's 28 U.S.C. § 2255 petition after determining that his trial counsel was constitutionally ineffective for failing to file a motion to suppress evidence found during the search of Mr. Webster's residence. The basis of the motion to suppress was the misconduct of several officers from the Selective Crime Occurrence Reduction Enforcement (SCORE) unit, special officers used only to enter and secure the residence prior to its search by the narcotics officers who obtained the search warrant. Unbeknownst to the narcotics officers, the SCORE officers stole personal property from Mr. Webster's residence during their initial securing of the premises and its occupants. When the government subsequently revived the criminal case against Mr. Webster, he filed a motion to suppress all evidence seized at his residence, which the district court granted.

We consolidated the government appeals of the grant of § 2255 relief and the grant of the motion to suppress upon retrial. We now reverse, holding that because the search was not tainted by the SCORE officers' theft and the items they took were not used in evidence against Mr. Webster, the district court erred in granting the motion to suppress all of the evidence properly discovered during

-2-

the search by the narcotics agents. Given our conclusion that the narcotics officers did not flagrantly disregard the warrant or violate Mr. Webster's Fourth Amendment rights, we do not need to address Mr. Webster's ineffective assistance of counsel argument because any motion to suppress would have failed.

# I

## Facts and Procedural History

Kansas City, Kansas, police officers developed information through an informant that crack cocaine was being manufactured and distributed out of Mr. Webster's residence. Based on controlled buys made by an informant, as well as surveillance of Mr. Webster's residence, a narcotics officer in the Kansas City Police Department applied for and was granted a no-knock warrant to search Mr. Webster's residence at 2743 Haskell Avenue. The warrant specifically authorized a search for the following items: cocaine, drug paraphernalia, cash, and any records of narcotics transactions or documents which proved legal occupancy or control of the premises.

With a no-knock warrant approved, Kansas City Police narcotics officers executed the search warrant with assistance in advance from three SCORE officers. As was the custom of the police department, the SCORE officers were used to execute the entry and secure the residence for officer safety because the narcotics officers suspected firearms were present there. The SCORE officers

entered and secured the entire house in about five minutes. They located Mr. Webster and his wife, Tawana Webster, at the residence, along with two other people.

Five minutes after entry by the SCORE officers, narcotics officers entered and took control of the scene. During their search of the residence, the narcotics officers discovered more than 100 grams of crack cocaine, drug paraphernalia, a small amount of marijuana, and numerous pills. They also found eighteen firearms, two of which were located in close proximity to drugs.

Mr. Webster was indicted on one count of conspiracy to manufacture crack cocaine in violation of 21 U.S.C. § 846(a), three counts of distributing and one count of possessing crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a), one count of possessing firearms in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He pled guilty to the conspiracy count and to possession of a firearm in furtherance of a drug trafficking crime pursuant to a written plea agreement. The plea agreement contained a proposed sentence of 180 months, including 120 months for Count One and sixty months for Count Six, to run consecutively. In exchange for his guilty plea, the government agreed to forego filing a sentencing enhancement under 21 U.S.C. § 851 for Mr. Webster's prior felony drug conviction, which would have given Mr. Webster a mandatory minimum sentence of twenty years,

to be followed by up to ten years of supervised release. The government also agreed not to file any additional charges against Mr. Webster.

In his plea agreement, Mr. Webster waived his right to withdraw his guilty plea and his "right to appeal . . . [or] collaterally attack any matter in connection with this prosecution, conviction, and sentence." Aplt. App., vol. I at 64. The plea agreement specifically noted, however, that "[n]otwithstanding the foregoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel." *Id.* at 65.

When Mr. Webster appeared at his initial sentencing hearing, he addressed the court and stated he had recently became aware that the Kansas City Police Department's Internal Affairs unit had started investigating thefts by SCORE unit officers. Notably, his wife had filed a complaint with the Kansas City police claiming that during the search of their house, officers stole an iPhone, a PlayStation gaming system, 100 dollars in cash, and a Flip Camcorder. Mr. Webster asked for a continuance so he could discuss the theft issues with his attorney and consider whether or not to withdraw his guilty plea.[1] Mr. Webster's

---

[1] Mr. Webster explained the following to the court:

[T]here [were] just a couple more things that I felt like me and [my attorney] needed to talk about a little bit before you accepted my – my plea. And – and due to the fact that I felt there [were] new developments in my case, the – with Internal Affairs contact[ing] my wife about a complaint that was made about missing electronics and

(continued...)

trial counsel told the court that he did not believe it was in Mr. Webster's interest to withdraw his plea, particularly because he was concerned the government would then file a § 851 enhancement for the prior felony drug conviction. The court nevertheless continued the sentencing hearing pending Mr. Webster's motion to withdraw his plea, which his attorney filed the next day.

At Mr. Webster's second sentencing hearing, the district court denied his motion to withdraw the plea. The court sentenced Mr. Webster to 180 months, pursuant to his plea agreement, to be followed by five years of supervised release. Mr. Webster filed a *pro se* notice of appeal, which we denied as untimely.

The day after Mr. Webster filed his *pro se* notice of appeal, the Kansas City Police Department, in conjunction with the FBI, conducted a sting operation that caught several members from the SCORE unit stealing personal property during a search conducted pursuant to a warrant. Mr. Webster's PlayStation gaming system and the camcorder were subsequently recovered from the possession of two of the SCORE officers who had participated in the initial execution of the search warrant at Mr. Webster's residence. As a result of this investigation, the

---

[1](...continued)
money out [of] my house due to official misconduct by the Kansas City, Kansas SCORE unit, and I felt like it was just other things that I needed to talk to with my legal counsel before the judge accepted my plea.

Aplt. App., vol. I at 73.

SCORE officers involved in the search of Mr. Webster's residence, Jeffrey M. Bell, Darryl M. Forrest, and Dustin Sillings, were indicted and charged with conspiring to deprive Tawana Webster and others of their civil rights by stealing property during warrant searches, in violation of 18 U.S.C. § 241, among other charges. All of the officers pled guilty to the conspiracy charge pursuant to plea agreements.

Due to the indictment of the SCORE officers, Mr. Webster filed a *pro se* motion § 2255 petition to vacate his convictions. He argued that his trial attorney was constitutionally ineffective for failing to file a motion to suppress all evidence recovered from the search of his house because of the thefts by the officers. The district court determined that his claim for ineffective assistance of counsel was not barred by his plea agreement and appointed counsel for Mr. Webster. The court ordered the parties to file briefs on whether the misconduct of the SCORE officers during the search amounted to flagrant disregard of the warrant, requiring suppression of all evidence seized pursuant to our precedent. *See United States v. Medlin*, 798 F.2d 407 (10th Cir. 1986) (*Medlin I*), and *United States v. Medlin*, 842 F.3d 1194 (10th Cir. 1988) (*Medlin II*).

During Mr. Webster's second § 2255 hearing, the district court found the following concerning the misconduct of the SCORE officers:

> Here, we have a situation that the court believes and sincerely hopes is unique. *The SCORE Unit members who took the items were acting alone, without the knowledge or help of the agents executing the*

-7-

*search warrant*. They also took the items for personal reasons unrelated at all to law enforcement or the case against [the] defendant. They stole the items. *They did not list the items on the warrant return or intend to use them as evidence against defendant.* It is true, the officers only took a few electronic items, but it is also reasonable to infer that this choice was deliberate, given the surreptitious nature of their actions. The officers have since been prosecuted, convicted, and sentenced for their actions. The court has not found a case directly on point, but has trouble imagining many more egregious abuses of authority than that exhibited by the SCORE officers. They entered defendant's home under the warrant, and then used that legitimate mode of entry to gain access to defendant's possessions, and to take them, and take them for their own use or gain. If these actions do not constitute, . . . flagrant disregard, . . . for the scope of the warrant, the court questions whether the standard could ever be met short of a case that mirrored Medlin or Foster. The court, therefore, finds that defendant's Fourth Amendment claim would have been meritorious, and that if filed, blanket suppression would have been warranted.

Aplt. App., vol. II at 286-87 (emphasis added).

The district court framed the issue as whether "defense counsel was ineffective for failing to file a motion to suppress based on the actions of the SCORE officers during execution of a search warrant at defendant's house." *Id.* at 282. The court explained that Mr. Webster was informed by the government before he moved to withdraw his guilty plea that the FBI was investigating the SCORE officers, but that counsel did not ask the government "about continuing matters to see how" the investigation "would play out." *Id.* at 288-89. The court found that "counsel's failure to file a motion to suppress was not reasonable under the circumstances," and that "[a]t a minimum, . . . counsel should have researched [the] potential impact of defendant's claims before filing the written motion to

-8-

withdraw" Mr. Webster's guilty plea. *Id.* The court held that counsel's deficient performance prejudiced Mr. Webster because had trial counsel filed a motion to suppress, it would have been successful and the outcome of the case would thus have been different. *Id.* at 287.

The district court orally granted Mr. Webster's § 2255 petition "on this one limited issue," and explained that "[a]s a result, defendant is, therefore, entitled to have his conviction vacated," and is entitled to a new trial. Aplt. App., vol. II at 290. The court filed a written order on the same day, stating: "For the reasons set forth on the record on May 5, 2014, the judgment dated February 9, 2011, is vacated." *Id.* at 295. The government filed a motion to reconsider, which the district court denied.

Mr. Webster subsequently filed a motion in his reinstated criminal case to suppress all evidence found during the search of his residence. Following briefing and a hearing, the court granted Mr. Webster's motion, explaining that "the defendant has standing to challenge the search," that "the search was unlawful," and that therefore "blanket suppression of the items seized during the search is appropriate . . . for the same reasons previously put on the record at the [habeas] hearing." *Id.* at 310.

The government timely appeals from the grant of habeas relief and the subsequent grant of the motion to suppress in the reinstated criminal case. We consolidated the appeals and now address specifically whether the district court

erred.

## II

## Applicable Legal Standards

"On appeal of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and view the evidence in the light most favorable to the prevailing party." *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998). "[A]t a hearing on a motion to suppress, 'the credibility of the witnesses and the weight given to the evidence, as well the inferences and conclusions drawn therefrom, are matters for the trial judge.'" *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996) (quoting *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994)). However, "we review *de novo* the ultimate determination of the reasonableness of a search under the Fourth Amendment." *Id.*

"[T]he Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'" *United States v. Sells*, 463 F.3d 1148, 1153 (10th Cir. 2006) (quoting U.S. Const. amend. IV.); *see also United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) (*Medlin II*) ("[T]he Fourth Amendment mandates that search warrants particularly describe the place to be searched and the persons or things to be

seized."). In *Sells*, 463 F.3d at 1153, we noted that the "search warrant probable cause and particularity requirements serve two constitutional protections," the second being most relevant here. "First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause." *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). The second objective mandates "that those searches deemed necessary should be as limited as possible." *Id.* at 1154 (quoting *Coolidge*, 403 U.S. at 467).

In *Coolidge*, 403 U.S. at 467, the Supreme Court explained the Fourth Amendment rationale for requiring the search to be limited: "the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of the intrusion per se, but of a general, exploratory rummaging in a person's belongings. The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized." (citations omitted). As we recognized in *Sells*,

> [t]he particularity requirement is satisfied when the description of an item to be searched for and seized pursuant to a warrant enables the searcher to reasonably ascertain and identify the things authorized to be seized. Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit. However, the fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.

*Sells*, 463 F.3d at 1154 (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th

Cir. 1988) (internal quotation marks, citations, and footnote omitted)).

We reiterated in *United States v. Janus Industries*, 48 F.3d 1548, 1553

(10th Cir. 1995), that this particularity requirement prevents a 'general,

exploratory rummaging in a person's belongings,' (quoting *Coolidge*, 403 U.S. at

467), and 'makes general searches . . . impossible and prevents the seizure of one

thing under a warrant describing another,'" *id.* (quoting *Coolidge*, 403 U.S. at

467; *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). Importantly, "[a]s to what is

to be taken, nothing is left to the discretion of the officer executing the warrant."

*Id.* (quoting *Stanford*, 379 U.S. at 485). "Thus, the 'particularity requirement'

prevents general searches and strictly limits the discretion of the officer executing

the warrant." *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009).

"The ordinary remedy for a search conducted or items seized in violation of

the Fourth Amendment's warrant requirement is suppression." *Sells*, 463 F.3d at

1154; *see also United States v. Olivares-Rangel*, 458 F.3d 1104, 1108 (10th Cir.

2006). But we have made clear that "the general rule is that only the improperly

seized evidence, not all the evidence, must be suppressed, *unless there was a*

*flagrant disregard for the terms of the warrant*." *United States v. Hargus*, 128

F.3d 1358, 1363 (10th Cir. 1997) (emphasis added) (internal quotation marks

omitted); *see also United States v. Le*, 173 F.3d 1258, 1269 (10th Cir. 1999)

(quoting *Hargus*). To be sure, "[w]hen law enforcement officers grossly exceed

-12-

the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." *Medlin II*, 842 F.2d at 1999.

"The basis for blanket suppression when a search warrant is executed with flagrant disregard of its terms is found in our traditional repugnance to 'general searches' which were conducted in the colonies pursuant to writs of assistance." *Foster*, 100 F.3d at 849. The Supreme Court recognized as far back as 1927 in *Marron v. United States*, 275 U.S. 192, 195 (1927), that "[g]eneral searches have long been deemed to violate fundamental rights," and that "[i]t is plain that the [Fourth] amendment forbids them." The Court explained:

> In order to ascertain the nature of the proceedings intended by the Fourth Amendment . . . under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in this discretion, to search suspected places for smuggled goods, which James Otis pronounced "the worse instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that was ever found in an English law book, since they placed "the liberty of every man in the hands of every petty officer."

*Id.* (some quotation marks omitted) (quoting *Boyd v. United States*, 116 U.S. 616, 624 (1886)).

We have nonetheless made it clear that "blanket suppression is an extreme remedy," and we have rarely applied it. *Le*, 173 F.3d at 1270 ("In very rare cases,

however, we have applied the unusual remedy of blanket suppression."); *Foster*, 100 F.3d at 852 ("[T]he extreme remedy of blanket suppression should only be imposed in the most 'extraordinary' of cases."). In fact, only the Ninth Circuit and our Circuit have applied blanket suppression, and only in exceptionally egregious circumstances. *See, e.g.*, *United States v. Rettig*, 589 F.2d 418, 422-24 (9th Cir. 1978) (valid warrant transformed into general search where officers greatly exceeded scope of the warrant and evidence seized in bad faith was used to convict defendant; court of appeals held total suppression of all evidence was thereby warranted); *Medlin II*, 842 F.2d at 1199 (flagrant disregard of warrant mandated total suppression); *Foster*, 100 F.3d at 851 (same). In the majority of cases where the flagrant disregard issue has come up, however, we and other courts have held that the remedy of blanket suppression was not appropriate. *See, e.g.*, *Le*, 173 F.3d 1258, 1272 (no flagrant disregard where warrant authorized search for items related to explosive devices and officers confiscated fifty items, only eight of which could, "even under an interpretation of fact and law highly favorable to [defendant], be considered unrelated to explosives."); *United States v. 149,442.43*, 965 F.2d 868, 875 (10th Cir. 1992) (officers did not flagrantly disregard scope of warrant for search of drug-related items where, before seizing specific items not mentioned in the search warrant such as jewelry and vehicles, they contacted the assistant district attorney who advised them that the specific items could be seized as potential proceeds of illegal drug transactions); *United*

-14-

*States v. Chen*, 979 F.2d 714, 718 (9th Cir. 1992) ("[W]holesale suppression is appropriate under the flagrant disregard standard only when the officers transform the search into an impermissible general search by ignoring the terms of the warrant and engaging in indiscriminate fishing."); *United States v. Allen*, 416 Fed. App'x 754, 760 (10th Cir. 2011) (unpublished) (no flagrant disregard where items wrongfully seized "were not so numerous that their seizure . . . converted the warrant into a general warrant, or turned the search into a fishing expedition."); *United States v. Sissler*, 966 F.2d 1455 at *8 (6th Cir. 1992) (unpublished) (although some officers engaged in egregious misconduct by seizing items of home owners not described in warrant, all property seized from defendant, an overnight guest, was within scope of warrant; therefore blanket suppression not applied with respect to overnight guest).[2]

We affirmed a blanket suppression order in *Medlin II*, 842 F.2d at 1199-1200, where officers seized 667 items not identified in the warrant. We agreed with the district court's factual findings that the search became a "fishing expedition." *Id.* at 1199. Similarly, we affirmed a district court's blanket suppression order in *Foster*, 100 F.3d at 850, where officers admitted to disregarding the terms of the warrant and seizing anything of value. We agreed with the district court's factual finding that during the execution of the search

---

[2] These two unpublished decisions are not precedential but are cited for their persuasive value. *See* 10th Cir. R. 32.1(A).

warrant, "there was a wholesale seizure of Foster's property amounting to a *fishing expedition for the discovery of incriminating evidence*." *Id.* (internal quotation marks omitted).

We are mindful that these cases represent the very rare exception to the general rule that "[i]f evidence is illegally seized, . . . only the improperly seized evidence, not all the evidence, must be suppressed . . . . This is particularly true when the non-specified items are not admitted into evidence." *Hargus*, 128 F.3d at 1363 (quotation marks and citation omitted); *Le*, 173 F.3d at 1269-70. The Supreme Court has made clear that the exclusionary rule "is 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Herring v. United States*, 555 U.S. 135, 139-40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). In fact, the Court has emphasized that "the exclusionary rule is not an individual right and applies only where it result[s] in appreciable deterrence." *Id.* at 141 (internal quotation marks omitted). Significantly, "exclusion 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule." *Id.* at 140 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). As such, when applying the exclusionary rule, "the benefits of deterrence must outweigh the costs." *Id.* at 141. "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free – something that offends basic concepts of the criminal justice system." *Id.*

-16-

(quotation marks omitted).


**III**

**Analysis**

In light of the applicable law, we now turn to the arguments on appeal and the district court's findings in order to decide the central issue that is determinative of the government's appeal in both cases: whether the district court properly granted the motion to suppress. This issue is key because Mr. Webster's entire ineffective assistance of counsel claim depends on whether grant of the motion to suppress was warranted. The core question is whether the SCORE officers' conduct amounted to such flagrant disregard of the warrant that it tainted the otherwise valid execution of the warrant by unknowing narcotics officers, justifying blanket suppression of the properly seized evidence that was used to convict Mr. Webster.

Mr. Webster contends that blanket suppression is proper because, similar to *Medlin II* and *Foster*, his case is one of those rare ones justifying this "extreme" remedy. This is so because, he asserts, there can be no more egregious conduct justifying blanket suppression of all evidence than reckless, systematic, and intentional thefts by the SCORE officers, members of the police department who were eventually prosecuted and sentenced to prison time for these very crimes. The government counters that the facts here are distinguishable from those in

*Medlin II* and *Foster* and that the rogue actions of the SCORE officers did not rise to the type of conduct justifying the extremely rare remedy of blanket suppression by undermining the otherwise proper warrant and its execution. We agree with the government.

*Flagrant Disregard and the Fourth Amendment*

Mr. Webster asserts that this case "presents an even stronger showing of 'flagrant disregard' than what the Tenth Circuit addressed in *Medlin* or *Foster*." Aple. Br. at 23-24. He argues that because "[t]heir conspiracy [to steal] was intentional, illegal, and recurring; [and] the officers were caught red-handed only after a sting operation was set up following repeated thefts[,] . . . their culpability rises far above the level found in *Medlin II* or *Foster*, as their criminal convictions confirm." *Id.* at 24. The district court agreed, noting that the misconduct was especially "egregious" because the officers "entered defendant's home under the warrant, and then used that legitimate mode of entry to gain access to defendant's possessions, and to take them, and take them for their own use or gain." Aplt. App., vol. II at 286-87. While we sympathize with the district court's outrage over the criminal actions undertaken by police officers sworn to protect the public from crime, we are not persuaded that the exclusionary rule was intended to govern in the circumstances of this case.

One key finding by the district court, supported by the record, is significant here: the "SCORE unit members who took the items were acting alone, without

-18-

the knowledge or help of the agents executing the search warrant." *Id.* at 286.

This finding distinguishes Mr. Webster's case from *Medlin I*, *Medlin II*, and

*Foster*, the controlling line of cases in which we have applied the extreme remedy

of blanket suppression.

In *Medlin I*, 798 F.2d at 411, we recognized that "flagrant disregard for the

limitations of a search warrant might make an otherwise valid search an

impermissible general search and thus require suppression or return of all

evidence seized during the search." We explained: "Because of the large number

of seized items not listed in the warrant, it is possible the police used this warrant

as a pretext for a general search, which would taint the whole search." *Id.* We

remanded for an evidentiary hearing so the trial judge could determine "whether

any illegality attended the search and if so, whether the improper conduct was so

flagrant that exclusion of *all* the seized evidence is warranted." *Id.* On remand,

the district court suppressed all of the evidence and the government appealed.

*Medlin II*, 842 F.2d at 1195 (citing trial court's finding on remand).

We affirmed the district court's decision. We observed that the "search

warrant was executed by three ATF agents who were accompanied by one or two

officers of the town police department and Deputy Carter." *Id.* at 1195. Pursuant

to the warrant, "the ATF agents searched the Medlin residence and seized

approximately 130 firearms. While the ATF agents searched for evidence of

federal firearms offenses, Deputy Carter combed Medlin's residence for suspected

-19-

stolen property which he believed to be evidence of state offenses." *Id.* at 1195-96. We emphasized that "[b]y the time the search was concluded Deputy Carter had seized some 667 items of property none of which were identified in the warrant authorizing the search." *Id.* at 1196.

The "nature of the cooperation between federal and local law enforcement officials in the execution of a federal search warrant [was] the basic issue on appeal." *Id.* The testimony in the evidentiary hearing "establishe[d] that the local police officers were acting under federal authority and were subject to federal control when they were present at the search pursuant to the warrant issued to the ATF agents." *Id.* Key to our decision was the collusion between the federal agents and state officers. The "record contain[ed] suggestions that the ATF agents participated in Deputy Carter's activities at the Medlin residence." *Id.* at 1197. Significantly, we explained:

> The facts that the transportation of all the seized items was prearranged by Deputy Carter, apparently upon agreement with the ATF agents, and that the ATF agents assisted Deputy Carter in loading the 667 items unauthorized items into the horse trailer are troubling in that they show that the ATF agents were, at the very least, passive participants in an unauthorized activity which Deputy Carter had planned when he accompanied the ATF agents on their authorized search for firearms. This record shows that the ATF agents and Deputy Carter were aiding *each other* in their investigations in the guise of a search authorized by federal warrant.

*Id.* (emphasis in original). Given this collusive conduct, we concluded that "the ATF agents' failure to prevent the flagrant disregard for the terms of their search

warrant, a failure for which they are accountable, renders all the fruits of the firearms search inadmissible in evidence against Medlin." *Id.* at 1200.

*Medlin II* is readily distinguishable from the present case in important respects. The officers there worked together and knew of each others' improper activities from the start, a fact that is not present in Mr. Webster's case. Instead, here we have a valid warrant properly executed by the narcotics officers who conducted the search for particularized evidence. While there was egregious misconduct on the part of the SCORE officers, who stole items from the residence, the district court specifically found that the narcotics officers were unaware of that conduct. We cannot attribute the thefts of the SCORE officers to the narcotics officers where they neither knew of the misconduct or assisted in it. Morever, in this case SCORE officers stole four items, unlike in *Medlin II*, 842 F.2d at 1197-99, where officers seized 667 items not named in the warrant. With no connection between the SCORE officers' surreptitious conduct and the otherwise valid and independent seizure of particularized evidence by the narcotics officers pursuant to the warrant, Mr. Webster's case is not the type of extreme case where we have found flagrant disregard warranting blanket suppression of evidence that was properly seized.

Mr. Webster's case is also distinguishable from the circumstances in *Foster*, 100 F.3d 856. There, a valid warrant authorized a search of Foster's residence for marijuana and four specific firearms. *Id.* at 848. Although police

executing the search warrant located the items listed in the warrant within an hour, they continued to search for another six hours, seizing "anything of value in the house." *Id.* at 848. In fact, one of the officers executing that particular warrant admitted that "*the officers took anything of value and that was standard procedure in the execution of a Sequoyah County search warrant*."[3] *Id.* at 850. We concluded accordingly that the officers flagrantly disregarded the warrant, holding that

> at the time he obtained the warrant, Martin, well aware of Sequoyah County "standard procedure," knew that the limits of the warrant would not be honored. He also necessarily realized that the warrant would be used to conduct a general search and seizure of Foster's property. In light of the district court's undisputed findings of fact, it is readily apparent that the officers obtained the warrant for a dual purpose: (1) a disclosed and legitimate search for illegal weapons and drugs in Foster's home; and (2) an undisclosed and improper "fishing expedition" for evidence of additional crimes. Thus, even under the dissent's reading of *Medlin II*, it appears that blanket suppression is the appropriate remedy.
>
> In reaching this conclusion, we agree with the dissent that the extreme remedy of blanket suppression should only be imposed in the most "extraordinary" of cases. This case is one of those exceedingly rare cases.

*Id.* at 852.

*Foster* thus does not support Mr. Webster's argument. In this case, there is

---

[3] "[Officer] Martin admitted that this was the standard practice in Sequoyah County, that the officers in the county had been conducting searches this way for as long as he could remember, and that they did so in an effort to turn up evidence of additional crimes." *Foster*, 100 F.3d at 850-51.

no evidence the narcotics officers treated their warrant as a general warrant, nor that they continued to search Mr. Webster's house beyond a reasonable time. Nor is there any evidence of a taint between the criminal activity of the SCORE officers and the proper seizure of evidence by the narcotic officers. The facts that made *Foster* such an extreme case are simply not present here.

Finally, we reject Mr. Webster's argument, relying on *Davis v. United States*, 131 S. Ct. 2419, 2423 (2011), and *Herring*, 555 U.S. at 143-44, that the exclusionary rule should be applied as a deterrent because of the egregiousness of the SCORE officers' conduct. Those cases actually support the government's position, that blanket suppression is improper here. As the Court discussed in *Herring*, 555 U.S. 140, "[t]he fact that a Fourth Amendment violation occurred – *i.e.*, that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies." Indeed, the Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a violation of the Fourth Amendment." *Id.* at 141.

The Court made clear in *Herring* that before applying the exclusionary rule, the "possible benefit must be weighed against [its] substantial societal costs." *Id.* Although the Court recognized "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional," *id.* at 143, as was the conduct of the SCORE officers here, the Court also noted that "[w]e have never suggested that the exclusionary rule must apply in every circumstance in

which it might provide marginal deterrence." *Id.* at 141. To be sure, "'to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial societal costs.'" *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987)).

We see little if any deterrent effect on future police conduct were we to affirm the district court's finding in the present case that blanket suppression of all the evidence seized is warranted. Not only do the facts of this case not rise to the level of the general searches in *Medlin II* or *Foster*, but the SCORE officers here were arrested, criminally prosecuted, and convicted. We cannot imagine any better deterrence than criminal prosecution. Without a connection between the SCORE officers' criminal conduct and the evidence properly seized by the narcotics officers, we think the societal costs outweigh the benefits of exclusion of the evidence here. Accordingly, we hold the district court erred in granting the motion to suppress.[4]

---

[4] Given our holding that the district court erred in granting the motion to suppress, we need not address Mr. Webster's ineffective assistance of counsel claim. Mr. Webster was not prejudiced by his counsel's failure to file a motion to suppress that would not have succeeded.

**IV**

**Conclusion**

We REVERSE the decisions of the district court to grant Mr. Webster's § 2255 petition and to suppress the evidence in the subsequent criminal proceeding.